THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GREENSBORO DIVISION

CASE NO. 1:09-CV-646

_____

| | | |
|---|---|---|
| HOWARD L. KASTEL TRUSTEE | ) | |
| OF THE HOWARD L. KASTEL | ) | FIRST |
| TRUST DATED NOVEMBER 13, 1985 | ) | AMENDED COMPLAINT |
| And JOAN H. KASTEL | ) | |
| Plaintiffs | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| NUVEEN INVESTMENTS INC, NUVEEN | ) | |
| INVESTMENTS LLC and  ROBERT P. | ) | |
| BREMNER and MESIROW FINANCIAL | ) | |
| INC. and LAWRENCE M. COHEN  and | ) | |
| DEUTSCHE BANK AG, DEUTSCHE | ) | |
| BANK TRUST COMPANY AMERICAS, | ) | |
| DEUTSCHE BANK SECURITIES INC. and | ) | |
| MERRILL LYNCH & CO. INC, MERRILL | ) | |
| LYNCH PIERCE, FENNER & SMITH and | ) | |
| and CITIGROUP GLOBAL MARKETS | ) | |
| Defendants | ) | |

1

FIRST AMENDED COMPLAINT FOR DECLARATORY
JUDGEMENT, RESCISSION AND OTHER
EQUITABLE RELIEF AND DAMAGES AND OTHER RELIEF

Plaintiffs Howard L. Kastel Trustee of the Howard L. Kastel Trust Dated November 13, 1985 and Joan H. Kastel bring this action and file this Complaint, by and through their undersigned counsel, based upon personal knowledge as to their own acts and upon their investigation exceeding 1400 hours, which included among other things, a review of: (a) public statements and marketing materials and other documents written or published by Nuveen Investments, Mesirow Financial, Deutsche Bank, Merrill Lynch, and CitiGroup (all of whom are more fully identified below) and their affiliates, agents and employees; (b) United States Securities and Exchange Commission filings made by SEC and by the Defendants; public filings and statements made in court proceedings and civil government and regulatory investigations involving Auction Rate Securities, including but not limited to other proceedings involving other parties; (c)Complaints, Orders, Filings by the State of North Carolina Department of the Secretary of State and other similar documents filed in proceedings in other states against certain Defendants: (d) Statements and press releases by the SEC Staff, Congressional Hearings; (e)Reports and Studies published by the Securities Industry Financial Marketing Association (SIFMA) including "Best Practices for Broker-Dealers of Auction Rate Securities" dated 2007; Reports prepared by the Auction Rate Securities Task Force on behalf of the North American Securities Administrators Association (NASAA); Study by NERA Economic Consulting and Works Cited and Bibliography referencing Auction Practices prepared by Certain Defendants;

2

Chicago Federal Reserve Bank Letter "Explaining the decline in Auction Rate Securities"; and numerous other authoritative reports; and Advisory published by PriceWaterhouseCoopers re: Investors' Classification of Auction Rate Securities dated March 4, 2005; (f) documents believed to be authentic, copies of internal emails and other business records, and securities reports, press releases and media reports and (d) discussions with representatives of the Defendants, Investors and other persons.

## PRELIMINARY STATEMENT

1. Commencing not later than November 2002, the Defendants orchestrated a cruel hoax on thousands of "Innocent Investors including the Plaintiffs" ["Investors"], over several years involving billions of dollars. The securities— Nuveen Auction Rate Preferred Securities ('ARPS")--were purportedly explained in complex prospectuses (that were in part false and misleading) that almost nobody read including the broker-dealers and financial advisers who had intentionally misrepresented the characteristics of the ARPS as "safe and liquid", "virtually risk-free cash equivalents" and "just like money markets". Nuveen, as if by a magic wand, purportedly turned perpetual (the securities had no maturity date) long term bond-like shares into mysterious short-term securities, hiding the risks by complexity and obstification. The ARPS were deliberately designed to fail the moment the Underwriter Broker Dealers decided to stop their support and like most Ponzi Schemes, "stick it' to the Investors caught when the scheme collapsed. Predictably the ARPS failed. THE NUVEEN ARPS HAD ALL THE INGREDIENTS OF A 'POISON COCKTAIL-- INVESTORS WHO TRUSTED THEIR ADVISERS, A SHAM AUCTION MARKET CONTROLLED BY AND

3

NUVEEN AND THE UNDERWRITERS, OPAQUE DISCLOSURES, NO
HARD 'PUT' TO ALLOW THE INVESTORS TO SELL OR REDEEM THEIR
SHARES, AND LOW DEFAULT INTEREST RATES . The advisers knew that
their Investors maintained objectives designed to place the money in safe liquid
investments. The Kastels didn't have the vaguest idea of the complicated risks
which were never disclosed to them. The truth was that the "Preferred shares"
were high-risk. The so-called "Preference" was worthless. The Kastels discovered
the truth over a period of months after the ARPS collapsed. The complex
securities were DERIVATIVES, whose interest calculations were derived from an
opaque and fixed auction mechanism, that ultimately default to an interest rate
derived from another blended interest rate that itself was a DERIATIVE. The
Investors would be exploited until Nuveen itself decided that it was in its own
selfish best business interests to begin to redeem the ARPS. Investors were lured
by misrepresentations which were facilitated by the SEC's failure to take effective
action to end the fraud. To make it even more outrageous, the Defendants continue
to collect payments in the form of fees from the Nuveen Funds that continued to
wrongfully hold the Investors money. Everything was rigged from the beginning.
The SEC discovered elements of the Fraud in a 2004-6 as a result of a flawed
investigation, but failed to understand or intentionally ignored the magnitude of
wrongdoing it found. Specifically the SEC failed to comprehend the fact that the
fraud was intentional and outrageous and constituted a Ponzi Scheme that patently
violated the SEC's Rules. As a result the Defendants would continue their
unlawful conduct until February 2008. Investors did not discover the Fraud until
the market for ARPS collapsed and Nuveen disclosed certain facts in a printed Q &
A that were an admission that the ARPS were risky. After the collapse, Investors,
including the Plaintiffs, called the brokers who sold ARPS, only to find out that

4

they did not have the prospectuses either. During the ten year period ending in 2008, Plaintiffs were never provided any prospectuses for any Nuveen Fund Shares they purchased. Meanwhile the SEC and certain states would seek orders to force certain Defendants to redeem certain ARPS, but the SEC would refuse to act against Nuveen, and Mesirow. The Funds according to one of the states had "plenty of undistributed income". From the beginning, the market for the Nuveen ARPS was unsustainable. Although structured to go bad, when they collapsed, Nuveen would get to keep the money at the misleading "Maximum Rate" which term translated into plain English was at the "Lowest rate".

## INTRODUCTION

2. This lawsuit seeks to recover THE BALANCE of $2.2 million of the Plaintiffs' ("the Kastels") money that was unlawfully obtained pursuant to a multi-billion-dollar fraudulent scheme perpetrated by Defendants Nuveen Investments Inc ("Nuveen") and its affiliates, Nuveen Investments LLC, The Nuveen North Carolina Funds (hereafter identified in Paragraph 3 below) and by its Chairman of the Board, Robert P. Bremner; Mesirow Financial Inc ("Mesirow") and Lawrence M. Cohen; Deutsche Bank AG and its affiliates ("Deutsche Bank"), Deutsche Bank Trust Company Americas, Deutsche Bank Securities Inc; Merrill Lynch & Co. Inc and its subsidiaries ("Merrill Lynch") wholly-owned by Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith; and CitiGroup Global Markets ("CitiGroup") and its subsidiaries and affiliates. The Amount this lawsuit now seeks to recover is $8.1 million, which includes a balance of $500,000, lost interest to date in excess of $500,000, Consequential Damages in an amount of $500,000 and Exemplary damages of $6.6 million and Attorney's Fees as shall be

allowed by the Court. In August and September 2007, Mesirow purchased 88 shares for $25,000 a share of Auction Rate Preferred Securities ("ARPS") (also referred to as Auction Rate Securities or "ARS") issued by three Nuveen North Carolina Closed End Funds ("CLE") for the Kastels' accounts with and through Nuveen at so-called self styled Dutch Auction arrangements sponsored by Nuveen and orchestrated by Deutsche Bank in concert with auction participants Merrill Lynch and CitiGroup. Although Nuveen purported to identify and describe the funds as "Closed End Funds", that description is intentionally misleading since, in fact, the Funds were "Closed" "Open End Funds". The reason that distinction was important was to support remarketing of the ARPS to Innocent Investors without delivery of a Prospectus or disclosure statement. All of the Defendants knew that if they delivered an understandable and truthful disclosure statement it would torpedo their scheme. As a direct and proximate result of the unlawful conduct of the auction participants, the Kastels continue to hold 20 shares of the Nuveen North Carolina ARPS and as of April 2010 are still unable to redeem them. The interest paid on the ARPS is unconscionably low and inadequate. It does not fairly compensate the Kastels for these long-term debt instruments that have no maturity date. The suit also seeks to recover interest in respect to shares of other Nuveen so-called Closed End Funds that Mesirow and Nuveen sold to or were held by the Kastels, during the years 2003 to 2007. These also were marketed as, and falsely represented to be, short-term, money market like investments. These ARPS were long term preferred shares with no maturity date. But for the fraud, the fair interest rate of said ARPS would have been at least two times the interest that was paid. Each of the Defendants is liable, because each and all of them, acted in concert with the other Defendants and had a substantial role in perpetrating the fraud.

Each of the Defendants participated in the Fraud and approved the actions of the others.

3. THIS LAWSUIT IS NOT A CLASS ACTION. Although the Fraud complained of herein injured many innocent investors, the specific facts and detailed claims in this Amended Complaint relate to the Kastels. This Amended Complaint contains detailed pleading of acts and facts that provide the grounds upon which the claims rest and to demonstrate through numerous factual allegations that raise their right to relief above a speculative level. The Plaintiffs conducted a burdensome investigation that addressed the requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995. Some of the allegations are based on the investigations referenced above and are well known to the Defendants. Although certain claims are not covered by the heightened pleading requirements, the detail provided is intended to demonstrate a clear understanding of the Plaintiffs' pleading obligation. Many of the conversations and meetings are contained in documents produced and copied in the SEC and State investigations, some of which are attached as exhibits in certain cases brought against the Defendants that the Defendants have an obligation to retain.

4. Certain of the Defendants have participated in the fraudulent scheme in or through their wholly owned subsidiaries. Reference to Nuveen includes Nuveen Investment Inc., Nuveen Investments LLC ("the Nuveen Broker Dealer"), Nuveen Asset Management, Inc. (identified by Mesirow in a letter dated March 27, 2008 and as Nuveen Asset Management in a Semi-Annual Report the Kastels first received on February 16, 2008), the Nuveen North Carolina Closed End Funds, and Nuveen's parent affiliated with Merrill Lynch. Reference to Deutsche Bank

includes Deutsche Bank Trust Company Americas and Deutsche Bank Securities Inc. Reference to Merrill Lynch & Co. Inc includes Merrill Lynch Piece, Fenner & Smith Incorporated. Reference to CitiGroup Global includes CitiGroup Global Markets, Inc. and its affiliates. Nuveen and the Broker Dealers are also collectively referenced here as the "Underwriter Broker Dealers" and "Remarket Underwriters". Nuveen is also referenced herein as the "Sponsor" and as the "Manager". Defendants Deutsche Bank, Bank of America and Merrill Lynch, and Citigroup operate their businesses interchangeable amongst various subsidiaries and affiliates. Each of the parent corporations is liable because, at all relevant times, each had the ability to control its subsidiaries and employees, and exercised its control. These relationships have become complex by various mergers, acquisitions, combinations and affiliations.

5.Nuveen North Carolina Funds include:

     a) Nuveen North Carolina Premium Income Fund Series TH (NNC)

     b) Nuveen North Carolina Dividend Advantage Municipal Fund Series T (NRB)

     c) Nuveen North Carolina Dividend Advantage Municipal Fund 2 Series F (NNO)

     d) Nuveen North Carolina Dividend Advantage Municipal Fund 3 Series W (NII)

As of February 15, 2008 the Howard L. Kastel Trust owned 83 ARPS issued by NNC, NNO and NII. Joan H. Kastel owned 5 ARPS issued by NNC. Neither of the Kastels own ARPS issued by NRB.

6.  This action seeks Equitable Relief, including Recession or Recessional Damages and the disgorgement of monies procured by fraud.

7.  Plaintiffs also are informed and believe that there were additional participants in the fraudulent scheme described in this action.  Nuveen cited 26 auction participants in its Congressional Testimony in September 2008.  Nuveen claims that the identity of the Authorized Auction Participants is not public information and has refused to disclose this information.   Nuveen, however, advised that  "it is safe to assume that this includes most of the major broker/dealer firms".  Plaintiffs state that said Participants have been the targets of SEC Complaints relating to Auction Rate Securities including orders to redeem over $50 billion of ARS and hundreds of  $ millions of penalties.  The Complaints and orders allege substantial violations of the U.S. Securities Laws and Restraining Orders.

8.  Plaintiffs seek a Declaratory Judgment that the Client Agreements, and specifically the arbitration provisions contained therein, that the Kastels executed while residents of Illinois, are not enforceable against them now that they are North Carolina Residents by reason of:

    a)   Mesirow's letter dated August 27, 2009 agreeing not to assert a right to arbitration;

    b)   the agreements purport to apply the Arbitration Laws of the State of New York in the case of Howard L. Kastel, a state that has no connection with the claims against Mesirow;

    c)  In the case of the Howard L. Kastel Trust, no agreement was executed that provides that the provisions of the 1989 agreement dated August 15, 1989, executed by Howard L. Kastel individually, apply to the Trust;

9

d) This suit is a single dispute. Mesirow has, at all times material hereto, treated the accounts of the Kastels as "Consolidated Accounts". Mesirow had minimal dealings with Joan H. Kastel;

e) Finally and most importantly, Mesirow did not act alone..

f) This action involves claims under the securities acts of North Carolina and Illinois, which, in pertinent part, provide for joint and several liability and equitable relief. It would be impossible to adjudicate the rights of the parties in a consistent manner in an Arbitration proceeding involving only one party;

g) An Award by an Arbitration panel will affect the Kastels' right against the other parties;

h ) Moreover, this action seeks Equitable Relief not available in arbitration.

i) It is further stated, as grounds for this Declaratory Judgment, that most of the major dealers including certain of the Defendants have been subject to two sets of Cease and Desist Orders as a result of actions brought by the United States Securities and Exchange Commission and other regulatory agencies, the first in 2006 an 2007 and the second in 2008 and 2009. Mesirow knew of the Cease and Desist Orders and also, on information and belief, knew that the Respondents continued the unlawful practices until February 2008;

j) Theft by Deception and Obtaining property under false pretenses are violations of the Criminal Laws of North Carolina and as such constitute Torts and are not subject to arbitration;

o) Intentional or Infliction of emotional distress is a Tort and said conduct is not subject to arbitration.

9.  This action also seeks recovery of consequential damages and exemplary damages (other than in respect to the claims under the Securities Exchange Act of 1934) because of Defendants intentional, outrageous and inexcusable course of conduct and because all of the Defendants continued practices that violated the 2006 and 2007 restraining orders.  Exemplary and punitive damages are necessary and appropriate.

10.  This action alleges claims involving allegations in respect to violations of the Securities Exchange Act of 1934 (the "Exchange Act) that were asserted against the Defendants in the SEC's Civil Injunction Proceedings. The Defendants have waived any claim of Double Jeopardy based on the terms of their settlements. Plaintiffs are currently prevented, by amendments to certain provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), from asserting claims under said act in the absence of a criminal conviction relating to the underlying unlawful acts.  Plaintiffs reserve the right to amend their complaint to add such claims. Plaintiffs further believe that RICO is or will be applicable to this Ponzi Scheme and securities fraud.  Both the Exchange described in this complaint and the Nuveen Funds are Enterprises and Nuveen, Deutsche Bank, Merrill Lynch and Citigroup and others who participated in this unlawful scheme are members of the unlawful scheme and engaged in a pattern of racketeering activity.

THE PARTIES

11.  Howard L. Kastel is the Trustee of the Howard L. Kastel Trust Dated November 13, 1985.  Howard L. Kastel is a resident of North Carolina.  Joan H. Kastel is the wife of Howard L. Kastel and is also a resident of North Carolina. The Trust has had an account at Mesirow since November 2002. There is no written "client account agreement" between Mesirow and the Trust.  Prior to November 2002 Howard L. Kastel had a Cash Account Agreement dated August 15, 1989.  Joan H. Kastel executed a Client Agreement prior to November 2005 The Kastels became residents of North Carolina in 2006 and do not conduct business in Illinois.  The addresses on the Kastels' account were changed to North Carolina in 2006.  Howard L. Kastel is 77 years old and a substantially retired lawyer except for part time employment as a Consultant, Arbitrator and Mediator. None of said employment activities are outside of North Carolina.  Joan H. Kastel is a 75 years old retired Public School Speech and Language Pathologist.


12.  Nuveen Investments Inc is incorporated in Delaware and its principal executive offices are located in Chicago Illinois.  Nuveen is the Sponsor and Investment Adviser to all of the self-styled Nuveen Closed End ARPS Funds that the Kastels invested in including the Nuveen North Carolina Funds.  Nuveen Investments LLC. is an affiliate of Nuveen, was controlled by Nuveen and also has it principal place of business in Chicago, Illinois.  Nuveen is and was the largest issuer of ARPS in the U.S.  The Nuveen Funds issued more than $11 Billion of Tax Exempt Municipal ARPS. The Nuveen North Carolina Funds issued a total of $120 million ARPS in the Nuveen North Carolina Funds.  For many years, Nuveen acted as Sponsor, Issuer, Underwriter, Manager and Brokers Dealer in connection with as many as 100 funds engaged in the marketing and sale of Auction Rate

Securities. On information and belief, Nuveen is currently the subject of an investigation by the SEC "In the Matter of Certain Auction Practices".  Nuveen is registered as a Broker Dealer in North Carolina and does business in North Carolina in connection with the Nuveen North Carolina Funds.  Commencing not later than August 2007, problems in the Auction Rate Securities Market were a topic of discussion and concern for Nuveen.  At all times material hereto, Nuveen knew that a "Dutch Auction" was designed to be a "blind auction".  To get around this, Nuveen and Deutsche Bank created an unregistered exchange and limited the members of the exchange to certain Underwriter Brokers Dealers in order to manage and control the "remarketing" of its ARPS.  Nuveen knew that marketing ARPS required a positive state of mind based upon trust that there was virtually no risk and that investors were purchasing money market like short-term cash like securities.  As early as August 2007, Nuveen became concerned with the number of failed auctions.  When Nuveen learned that one or more of  its auctions failed, it had an obligation to disclose that information.  Nuveen did not disclose these concerns because that would shake investor confidence.  Nuveen knew as early as August 2007 that disclosure of the risks to investors would cause the ARPS to no longer be a workable concept.  Nuveen continued to publish false and misleading statements as late as February 2008 such as:

> MuniPreferred is the preferred stock issued by Municipal Closed End Funds.
> It is designed to provide yields that compare favorably with OTHER
> SHORT TERM INVESTMENTS  [Emphasis added].  [This statement was
> FALSE]
>
> DAILY LIQUITY [Emphasis added].   There are auctions every day of the
> week.  [This statement was FALSE.  FAILS TO DISCLOSE THAT

WITHOUT  UNDERWRITER SUPPORT THE SHARES WERE
ILLIQUID]

In a statement filed with the SEC in early 2007,  Nuveen disclosed:

"Preferred shares of our closed-end funds are bought and sold through a
secondary market auction [Deutsche Bank].  A participation fee is paid by
the fund to the auction participants based on shares traded.  Access to the
auction must be made through a participating broker [Merrill Lynch,
CitiGroup, Nuveen, Deutsche Bank].  We offer non-participating brokers
[Mesirow Financial] access to the auctions, for which we earn a participating
fee".

This statement was distributed to certain Nuveen investors in a 2007 Report, but
was never disclosed by either Mesirow or Nuveen to the Kastels. The statement
contained information that was  material to the Kastels in respect to their 2007
purchases of Nuveen North Carolina ARPS.  Nuveen knew and but did not
disclose (until it admitted in a Press Release dated February 15, 2008, four days
after the  parallel action by the Underwriter Broker Dealers  failure to submit bids):

that the so-called auctions conducted by Deutsche Bank were rigged and
frequently experienced "supply/demand imbalance, and that, but for the fact
that certain Underwriter Broker Dealers "CUSTOMARLILY [emphasis
added] added to demand in the auctions" by making "so-called cover bids"
were illiquid long term perpetual so-called preferred shares.

Not later than January 23, 2008 Nuveen knew that Lehman Brothers, one of the
Underwriter Broker Dealers had stopped supporting the auctions and that the
auctions conducted by Deutsche Bank were in immediate danger of collapse.
Notwithstanding this knowledge, Nuveen transmitted nine HOLD orders in respect
to the Kastels' ARPS during the weeks of January 28, 2008, February 4 and 11,

14

2008 to Deutsche Bank. When these Hold Orders were placed both Nuveen and Mesirow knew of the enhanced liquidity risks. Had they known these facts, the Kastels would have demanded that the Hold orders be canceled and their ARPS liquidated immediately. As late as the third week in February, a representative of Nuveen told Howard Kastel, in a telephone conversation, that if he wanted any information regarding Nuveen's "weeklies' he should contact Mesirow Financial. Nuveen knew that brokers including Mesirow represented that the ARPS were short term, safe liquid securities and that Mesirow's customers including the Kastels would not have entrusted there monies if these securities did not fit this profile. Cohen and Mesirow repeatedly represented, in deliberate words and phrases at the time of each purchase that these securities met the Kastels' investment guidelines. By parallel conduct, and, in substantially identical statements, each of the other defendants knew that each of them were making similar representations. Nuveen also knew that Mesirow's customers were largely unaware of the risks and that Mesirow did not provide disclosure documents to them. The Kastels served a Notice and Demand for Rescission and/or Rescissional Damages on Nuveen Investments and Nuveen Investments, Inc , by Certified Mail dated February 21, 2008. The Kastel's did not receive a response to that Notice.

13. Robert P. Bremner is a resident of Washington D.C. Robert Bremner is the Chairman of the Board of the Nuveen North Carolina Funds and a member of the Board of Trustees since 1997. As Chairman of the Board of Trustees he has oversight responsibility over the management of the Fund's Investment Advisor and is a controlling person in respect to North Carolina Funds as that term is defined in the Exchange Act. The unlawful acts and practices participated in by

15

Nuveen and Nuveen Funds took place during the period when he was a member of the Board. The knowledge and acts alleged herein are attributed to Bemner.

14. Mesirow Financial Inc is incorporated in Delaware with its principal Executive Offices in Chicago Illinois. Mesirow is registered with the SEC as a broker-dealer and is registered as a broker-dealer in North Carolina. Mesirow Financial has an office in Charlotte North Carolina. Mesirow conducts business as an investment adviser, broker-dealer and consultant in North Carolina. Mesirow had a close relationship with Nuveen. Lawrence M. Cohen is a Senior Managing Director at Mesirow and was the Kastel's Investment Advisor. Because of the Howard Kastel long-term relationship with Cohen, Kastel reposed great trust and confidence in Cohen. Cohen acknowledged this trust and acted as an Advisor to the Kastels, which as matter of fact created a fiduciary duty. Mesirow and Cohen owed the Kastels the highest standard of care. Mesirow and Cohen knew that the Kastel relationship with them was "all about trust". Mesirow was motivated to buy risky ARPS for the Kastels because of the trail fees it received from Nuveen and Deutsche Bank. Mesirow was also incentivized to sell auction rate securities to its customers without disclosing the substantial risks of lack of liquidity, SEC enforcement Actions and other material facts because some of it officers and employees owned Nuveen Closed End Common Shares that benefited from the sale of the Nuveen ARPS. Mesirow and Cohen knew that if they disclosed the risks and other material facts to the Kastels, the Kastels would not have authorized the purchase of any Nuveen ARPS. Mesirow and Cohen knew they were required to provide the Kastels any information regarding their investments including Cohen's concern regarding the Liquidity risk that Cohen had discussed with a representative of Nuveen in November 2007. Cohen also discussed the issue

16

regarding liquidity on two occasions with another customer.  Notwithstanding Nuveen's knowledge that the illiquidity "was a clear and present danger", Mesirow and Cohen continued to place  and placed more than 30 Hold Orders during three months ended February 15, 2008 while repeatedly reassuring Howard Kastel in telephone conversation in "that his investment was safe".  As late as February 5, 2008, Mesirow demonstrated its consistent breach of duty by investing more than $100,000 in Nuveen ARPS notwithstanding another client's (Name deleted pending a protective order) specific instructions that the money be invested in a money market. Mesirow is the subject of investigations arising out of its sale of Nuveen ARPS, by the Secretary of State of Illinois Department of Securities, the North Carolina Department of the Secretary of State Division of Securities and the Financial Industry Regulatory Authority ("FINRA").  Mesirow holds the Kastels shares in its name.  As early as November 2007 Cohen and Mesirow became concerned with possibility of a failed auction involving Nuveen's ARPS but did not disclose these concerns to the Kastel's.  Cohen discussed these concerns with Nuveen.  On information and belief, in January 2008, they learned that one of Nuveen's ARPS auctions had failed.  As of February 15, 2008 Nuveen claimed to have no record of the Kastels and refused to provide information to Howard Kastel directing Kastel to contact Mesirow.  Mesirow continued to put in HOLD orders with Nuveen's Trading desk after January 23, 2008, the date of the failed auction. As a result of the fact that Nuveen did not have the name of either Howard L. Kastel Trustee or Joan H. Kastel they never received any reports or information concerning their investments until February 16, 2008.  That Nuveen Report did not disclose that an auction of Nuveen ARPS failed in January.   On February  21 the Kastels served Mesirow Financial Inc. with a Notice and Demand for Rescission

17

and or Rescessional Damages, Interest and Attorneys Fees. The Notice was sent
by Certified Mail.

15.  Deutsche Bank AG is a German cooperation headquartered in Frankfurt,
Germany.  Deutsche Bank is one of the worlds largest financial firms and does
business in the United States through its many subsidiaries including Deutsche
Bank Trust Company Americas ("DBTCA") and Deutsche Bank Securities Inc,
("DBSI") both incorporated in Delaware with their principal executive offices in
New York, New York.  Deutsche Bank AG marketed its BRAND NAME and
TRADE MARK in its advertising and promotional materials:

> "Deutsche Bank's auction agency business is the largest of its kind
> facilitating the majority of auctions in the marketplace…"
> "The services described in this brochure are provided by Deutsche AG or
> one or more of its appropriately licensed subsidiaries in jurisdictions around
> the world…In the United States of America, such services are provided by,
> among others, Deutsche Bank Trust Company Americas."  "No part of this
> brochure may be copied in any way without the prior written consent of
> Deutsche Bank AG".  "…we offer our clients a highly professional auction
> agency backed by the global infrastructure of Deutsche Bank."

The subsidiaries are licensed as a Broker Dealer and act as an auction specialist in
the Auction Rate Securities Market.  Deutsche Bank has an office in Winston
Salem, North Carolina and recently announced that it intended to open an office in
Cary, North Carolina .  According to court documents in the files of the Courts of
North Carolina, DBTCA was doing business in North Carolina.  In 2004, DBTCA
"provided input" in respect to a report published by the California Debt and
Advisory Commission which described "Auction Rate Securities [as] long term

18

variable rate bonds tied to short term interest rates". The report also disclosed that ARS "do not carry a "Put". The report also stated "A failed auction can occur due to a lack of demand…" Deutsche Bank has settled with the SEC and has paid penalties of $750,000 in 2007and $15 million in 2009 for its role in connection with the Auction Rate Securities Market. In January 2007, the SEC entered an order that found that DBTCA violated the Securities Act by permitting broker-dealers to intervene in auctions and submit cover bids to prevent failed auctions. This procedure gave the appearance of active trading and also affected the interest rate the Kastels received on their ARPS. In 2009, DBSI has also agreed to redeem $1.3 billion of Auction rate securities, but has refused to redeem any of the Kastels' ARPS. All of the Defendants had knowledge of the SEC's findings and none of them disclosed the contents of the 2007 order to the Kastels. Failure to disclose these material facts was part of Nuveen's scheme to hide their illegal Acts. In June 2009, "In the Matter of Deutsche Securities Inc," the New Jersey Bureau of Securities found that an affiliate of Deutsche Bank submitted supporting bids to prevent failed auctions and maintain (the illusion) of liquidity." "The findings….Deutsche Bank engaged in dishonest and unethical conduct….". Nuveen and Deutsche Bank earned billions in connection with the auctions. In February, the SEC knowingly appointed the former General Counsel of Deutsche Bank Trust Company Americas (effective April 2009) as its new Director of Enforcement. The SEC's new Director provided a certification letter that extended the time that DBTCA engaged in the fraud. He also participated (directly or indirectly) in settlement negotiations for one of the Defendant's subsidiaries in the Case the SEC settled in 2009. The Kastels served a Notice and Demand for Rescission and/or Rescissional Damages by Certified Mail dated February 21,

2008 and subsequently forwarded a duplicate copy together with other documents in a February 2009 follow up effort to qualify for redemption of the ARPS.

16.  Merrill Lynch & Co. Inc and Merrill Lynch, Pierce, Fenner & Smith are wholly owned subsidiaries of Bank of America and are among the world's largest investment banks . Merrill Lynch is incorporated in Delaware and its principal executive offices are in New York, New York.  Merrill Lynch has offices in North Carolina and is registered as a Broker-Dealer.  Commencing not later than August 2007, problems in the Auction Rate Securities Market were a regular topic of discussion and concern for Merrill Lynch.  On December 11, 2007 Merrill Lynch reported internally that the auction product was "flawed" and that "auctions arent (sic) going to come back." During December 2007, Merrill  was in frequent contact with other "provider/players in the auction market."  During the period 2003 to February 12, 2008 each of Merrill Lynch, CitiGroup, Deutsche Bank had conflicts of interest because they were acting in multiple capacities with full knowledge of the bids submitted by other auction participants and additionally submitted bids for their own accounts.  In fact each of the Defendants except Mesirow participated in the bid rigging.  The auctions were a sham.  The inside information was shared by and amongst the Underwriter Broker Dealers and was part of the unlawful conspiracy.  These activities constituted unlawful price fixing in violation of the SEC's 2006 and 2007 Cease and Desist Order. Meanwhile,  Mesirow and Nuveen continued to place Hold orders in the auctions while at the same time Mesirow continued to reassure Howard Kastel of the safety of his investment.  During the latter part of 2007 and January 2008, all of the Defendants had knowledge of the risk of auction failure.  Merrill Lynch and all of the defendants knew that if the auctions failed the investments would be frozen and illiquid and the value of the

20

shares would be materially reduced because of the inadequate and misleading "maximum rate". Merrill Lynch earned $billions from the Auction Rate Security Market. Merrill Lynch first settled with SEC in 2006 and has paid a penalty of $1,500,000. In 2008 Merrill Lynch, a wholly owned subsidiary of Bank of America,agreed to redeem more than $10 Billion of Auction Rate Securities and pay an additional penalty of $125,000,000. Neither Merrill Lynch nor Bank of American will redeem any of the Kastels' ARPS shares.

17. Citigroup Global Markets Inc. and subsidiaries and affiliates Solomon Smith Barney, Smith Barney and Morgan Stanley Smith Barney are also among the world's largest investment banks. Citigroup is incorporated in New York with principal executive offices located in New York, New York. Citibank and its affiliates and subsidiaries are registered as Broker Dealers in North Carolina and have offices and do business in the Middle District of North Carolina. Citigroup and its subsidiaries and affiliates were active participants in the ARPS auction market and have both paid large penalties and agreed to redeem $billions of Auction Rate Securities. In 2006 CitiGroup settled with the SEC and paid a fine of $1,500,000. In 2008, CitiGroup settled with SEC and agreed to Redeem $7.3 billion in Auction Rate Securities from their customers and pay a penalty of $100,000,000. During the period August 2007 to February 2008 CitiGroup continued to share material non-public information . Neither Citigroup nor its subsidiaries or affiliates will redeem any of the Kastels' ARPS shares.

18. As Broker-Dealers, most of the Defendants were members of FINRA and the Securities Industry and Financial Markets Association ("SIFMA"). Mesirow and the Defendants had knowledge of the Best Practices for Broker-Dealers of Auction

Rate Securities published SIFMA in Spring 2007 that provided in Section 4.2.4 that "Broker-Dealer should educate issuers and investors as to the material features of Auction Rate Securities". Mesirow and Nuveen failed to comply with these provisions in their dealings with Kastels.

19. Each of the Defendants, except Mesirow, acted under contracts with Nuveen and the Nuveen North Carolina Funds as Underwriters, Managers, Remarketing Underwriters, and Market Makers and participated in the manipulation of the auction markets conducted in respect to the Nuveen North Carolina Funds. Nuveen was also a remarketing underwriter. Each of said Defendants perpetuated an artificial market for the ARPS. Each of said Defendants, except Nuveen, has announced agreements to comply with Court Orders to redeem and reimburse certain eligible clients that were victims of the Auction Rate Scheme. The Kastels further state, on information and belief, that representatives of Nuveen have engaged in conversations and made representations to the SEC regarding the redemption of the ARPS. Each of the Defendants breached the terms of the 2006 and 2007 SEC Settlements and Restraining orders issued during the period 2006 to February 2008 and continued to engage in the unlawful acts complained of in this action.

Jurisdiction and Venue

20. The District Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. Sections 1331, 1332 and 1337 of the Exchange ACT (15 U.S.C. Section 78). The claims asserted herein arise under Section 10(b) and 20 (a) of the Exchange Act and Rule 10 (b) 5 promulgated thereunder by the SEC.

22

Additionally, claims are asserted under North Carolina statutory and common law, including but not limited to G.S. Sections 78 A-8, 8A-12 (5), Section 78A-56 and Section 78A-57; the Securities Laws of the State of Illinois, specifically Section 13 of the Illinois Securities Act which provides, in pertinent part that a sale made in violation of the provisions of the Act is void. The Defendant Corporations are organized under the laws of states other than North Carolina with their principal places of business in Chicago and New York. Robert Bremner is a citizen of Washington D.C. The Plaintiffs are both citizens of North Carolina. All persons including the issuer, controlling persons, underwriters, broker dealers and salesperson who participated in the unlawful sale will be liable to the purchasers for the full amount paid together with interest.

21. Plaintiffs state that notice of their election to rescind the sales of Nuveen North Carolina ARPS was served by Certified Mail on February 22, 2008, return receipt requested, and received by Mesirow Financial on February 27, 2008, Nuveen Investments on February 28, 2008 and Deutsche on February 27, 2008. By reason of Defendants breach of fiduciary duty and fraud, which was willful and reckless with wanton disregard for the rights of the victims rights, Plaintiffs seek to recover punitive damages.

22. As detailed in this complaint, the conduct the Defendants constituted a scheme to defraud and violate the antifraud provisions of the securities laws. Each of the Defendants committed acts in furtherance of the scheme. As detailed in this complaint, the nexus of the fraud and many of the acts took place in North Carolina. The Nuveen North Carolina funds held North Carolina Securities and were issued and sold to North Carolina residents. In 2007 the Kastels were North

Carolina residents. Mesirow acting with Nuveen were co-brokers and shared in the fees. Without Mesirow, the Kastels would not have been victims of this unlawful scheme. Each of the participants is liable for the damages caused by their co-conspirators. By reason of the conspiracy, each of the participants did business in North Carolina and were present in North Carolina and subject to the jurisdiction of this Court

23. This Court has supplemental jurisdiction of the state claims asserted herein because the state law claims arise from the same operative facts and form part of the same case or controversy as the claim brought pursuant to the Exchange Act. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. Section 78aa and 28 U.S.C. Sections 1391 (b), 1332 and 1337). Plaintiffs reside in this District and the defendants regularly conduct business in this district and North Carolina. The Defendants are all citizens of other states. In connection with the acts alleged by the Plaintiffs, the Defendants and each of them, directly or indirectly, used the mean and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone communications to fraudulently induce the Plaintiffs to purchase the ARPS at issue in this litigation.

### General Allegations

24. ARPS issued by the Nuveen North Carolina Closed End Funds and marketed by Nuveen through Mesirow and the Defendant Brokers-Dealers were perpetual preferred stock with no maturity date and no right of redemption that paid interest

at rates purportedly set at periodic auctions. ARPS were auctioned at par value so that the return on the investment to the investor was determined through the auction process. The true value of the ARPS, like any debt instrument , would be determined by the rate of return and the length of the term and other relevant and material factors. ARPS, however, were marketed and sold as highly liquid short-term investments with the risk characteristics of money market funds and as an attractive alternative to money market investors. In fact, Nuveen in its online "Glossary of Financial Terms" regarding ARPS state as follows:

> " auction rate preferred stock (ARPS)—A floating-rate preferred with the dividend rate reset by Dutch auction, typically every 49 days. The interest rate is usually subject to a maximum, and the issue is PUTTABLE at each auction."

> "cash equivalent—A short-term money market instrument, such as a Treasury bill or repurchase agreement, of such high quality and safety that it is virtually as good as cash."

> "closed-end fund—A fund that offers a fixed number of shares, which are traded on a stock exchange [the Auction was an unlawful stock exchange] just like stocks."

> "Dutch auction—An auction system where the price of the item being auctioned is gradually reduced until it elicits a responsive bid. Dutch auctions are used to sell U.S. Treasury bills and to set rates on some re-marketed floating-rate instruments and preferred stocks."

> "liquidity—The ability to easily turn assets into cash. An investor should be able to sell a liquid asset quickly with little effect on the price."

A puttable share is a share with rights to put the shares back to issuer at a specified price. In the case of the ARPS, the specified price is Par--$25,000. It is a right that allows the holder to choose to "put" the share.

One of the key elements of the Fraud was the intentional and fraudulent failure to deliver a copy of the prospectus to investors at the time they purchased the "Remarketed" Nuveen ARPS. The Kastels did not receive a copy of a Nuveen Prospectus until February 15, 2008. In an email dated February 15, 2008, Cohen wrote:

> "Howard—attached is a prospectus for one of the Nuveen offerings. It is
> not specific to one of the funds you own, but probably similar." (The
> Prospectus attached was for "Nuveen Insured Tax-Free Advantage
> Municipal Fund". The Kastel never owned any shares in that Fund.)

Prior to February 15, 2008, the Kastels and most ARPS investors did not have a clue about the liquidity risk or any other risk associated with the ARPS that were sold to them. Nuveen never intended that the risks of illiquidity to be transparent to the individual investors. In fact, the ARPS were exotic financial instruments traded in secret to the detriment of the Investors. All of the Defendants participated and contributed to the false perception of liquidity in the ARPS market. The Defendants' scheme masked the true nature of the ARPS.

25. Additionally, as disclosed to Congress in September 2008, Nuveen acted as co-broker with Mesirow on transactions engaged in by Mesirow and shared the fees with Mesirow for said transactions. As a result of its undisclosed co-broker status, Nuveen owed the same duties to Mesirow customers including the Kastels.

26

In the case of Mesirow that duty included a fiduciary duty to those clients who placed their special trust in Mesirow.

26. By no later than August 2007, each of the Defendants knew that the market for ARPS was diminishing, that auctions were being propped up and that the apparent liquidity was being artificially supported. They knew that there were side deals that were being kept secret. They also knew that none of the Investors in 2007 received copies of a prospectus (which were obtuse, complicated and misleading documents buried forever in the bowels of the SEC) and that no investor would conduct an independent investigation for the small additional interest they received. They also knew Investors faced serious risks that auctions would fail and the customer's money would be frozen. All of Defendants' covert activities were to designed to hide the facts. As a result of Defendants' the Kastels remained unaware of the facts and the undisclosed risks until after February 11, 2008. Each of Defendants perpetrated this hoax in order to continue to participate in the fees and in the case of all of Defendants, except Mesirow, act as lead underwriters and designated broker dealers in future Funds.

27. In respect to the Kastels, Mesirow made false representations by making statements that implied it had a reasonable basis to form a belief and believed that the Nuveen ARPS were safe, short term liquid securities. As securities professionals, Mesirow and Cohen had a "special duty" to its customers to undertake an adequate investigation of the securities it recommended and sold to its customers. Mesirow's conduct breached its duty to the Kastels. Additionally, Mesirow and Nuveen had a continuing obligation to the Kastels to monitor market conditions and make the Kastels aware of any relevant and material decision-

making criteria that would influence their decisions to continue to roll over the Nuveen weeklies. Had Mesirow and Nuveen shared this material information about the ARPS auction market and the continuing manipulation by the Underwriter Broker-Dealers, the Kastels would have redeemed or sold all of their Nuveen weeklies. During the period 2002 to the present time, Mesirow and Nuveen continued to share fees. On information and belief, all of the Defendants continue to be paid fees in connection the Nuveen ARPS.

28. Mesirow and Nuveen marketed Auction Rate Securities as safe, liquid short-term investments notwithstanding the fact that they knew that were not safe, liquid cash investments. In February 2008, the ARPS market froze leaving the Kastels and thousands of other investors unable to liquidate their investments and leaving them locked into the phony "maximum interest rates" that were a fraction of what long-term preferred shares of equal quality paid as interest. Moreover the term "Maximum Rate" implies that the rate was above market rates. A true market rate would have, at least in theory, enhanced liquidity for the ARPS and provided an incentive to purchasers to avoid the auction failures. The proximate cause of the auction-rate market collapse was the misrepresentations by the Defendants, their manipulation of the ARPS market and the select disclosure of the coming crash to some investors who were able to sell or redeem their ARPS prior to February 13, 2008. The proximate cause was also the fact that the ARPS did not carry sufficient maximum rates to ensure liquidity unless the Defendant Underwriter Broker-Dealers continued to secretly support the auction process. None of these material facts were disclosed to the Kastels. The so-called "Dutch auction mechanism makes the ARPS a form of derivative—that is the ARPS purportedly derive their interest rate based on the interest rate at a weekly auction. Moreover, these

derivatives were not safe securities and were made even more risky by the unlawful conduct of the Defendants. These derivatives were among the most risky. Money Market Funds are ineligible to hold ARPS due to SEC Rules, which restrict money market funds so securities with a final maturity date of 397 days or less; hence, these securities are by rule not short term liquid securities. The Kastels are forced to bring this lawsuit despite the fact the SEC and other state regulators have ordered the Participants to repurchase billions of the illiquid securities from their own customers and to pay hundreds of millions in fines as a result of their unlawful conduct. The Kastel and thousands of Investors have been left out of the settlements. Nuveen and Mesirow have played hardball since February 2008 and, unless the Nuveen investors purchased their ARPS from the one of the settling Defendants, they have been left out to fend for themselves while Nuveen and Mesirow continue to pay themselves large fees while they wrongfully hold the money.

29. The $2.2 million dollars represented a significant part of the Kastels' net worth. The income was material to the Kastel's retirement plan. Although, a portion of the Kastels' ARPS have been redeemed, Defendant's 4 intentional fraud has had a major economic and psychological effect on the quality of their lives and their health. As a result of the Defendants wrongful conduct, the Kastels have been forced to sell other securities at a loss of hundreds of thousands of dollars, turn down a loan to their son's small business that was suffering from the credit crisis, cancel vacation plans and other normal expenditures. At 77 and 75 years of age it is too late to start over. Mesirow's and Nuveen's conduct has caused the Kastels' severe emotion distress. It was foreseeable to said Defendants that their conduct described in this complaint would cause and inflict severe

29

emotional distress.  These allegations go far beyond a simple claim of delay in redeeming the Kastels' shares.  Said Defendants conduct were and were extreme and outrageous.  The delay in redeeming the Kastels' shares and the shares of other elderly investors intentionally caused severe emotional distress.  Nuveen and the Nuveen Funds have taken a "hard ball" attitude—in substance—"Can't you be patient and wait for us to work this problem out".  The Kastels were asked to wait for the world to change.


## Summary of the Facts of the Case

30.  Cohen was the Kastels' Investment Adviser and the Kastels enjoyed a relationship of trust and confidence with Cohen and Mesirow.  The Howard L. Kastel Trust has had an account with Mesirow for more than 6 years invested primarily in short-term municipal securities and money markets.  Howard Kastel opened an individual account with Mesirow Investment Services, Inc (merged or consolidated with Mesirow Financial) in 1988.  Howard Kastel had an account with Mesirow Financial until November 2002.  To the best of her recollection, Joan H. Kastel opened an account at Mesirow in or about 5 or 6 years ago when she transferred an account from another broker that she had inherited from her father.  The Kastels' Investment Adviser at Mesirow was Lawrence M. Cohen. Cohen was a CPA and a former partner of one of the largest National Accounting Firms.  Howard Kastel has known Larry Cohen since the early 1970s.  Cohen and Mesirow first purchased Nuveen Auction Rate Preferred shares ("ARPS") for the account of Howard Kastel in January 1998:

Nuveen Mun Advantage Pfd F 7 Shares $25,000 for a total of $175,000 and
Nuveen Mun Opportunity Pfd  M 7 Shares $25,000 for a total of $175,000.

At that time, Kastel had no information regarding these shares. At the time Cohen described the safety of the Nuveen shares. He explained that Nuveen Shares were "7 day munis" or "weeklies" and rolled every seven days. He stated that the Nuveen shares were "safe short term preferred"—the preference related to the rights in respect to the interest paid and the rights on liquidation. He also said that the rate of interest was determined at weekly auctions—hence the shares were auction rate preferred shares. Cohen never disclosed that the auctions were orchestrated by Nuveen and were not a public auction, for example, like short-term treasuries. Cohen said they were similar to money market shares except that they rolled over weekly. Cohen never disclosed that the shares had no maturity date, no right of redemption, not puttable and needed to be sold at an auction and had a risk of illiquidity. At the time Cohen did not identify the specific funds in which he intended to invest the Kastel's money. On information and belief, Mesirow's Trading desk selected the specific funds. No prospectus or disclosure document was furnished to Kastel. Had Kastel known of the undisclosed risks and the true facts related to Nuveen shares he would not have permitted Cohen to purchase any Nuveen shares for his account. Mesirow did not identify the shares until after they were purchased for Kastel's account. The shares of Nuveen Munis Advantage were sold in January 2001.

31. On January 9, 2002, Mesirow purchased 4 shares of Nuveen Real Estate Taxable SR W for the account of Howard L. Kastel Trust dated November 13, 1985 ("the Trust"). Mesirow established the Trust account in 2002 and this transaction occurred in the individual account of Howard Kastel. As in the case of all the Nuveen purchases, Cohen or Mesirow's trading desk designated the Fund in which the investment was made. Kastel has no present recollection as to the facts

related to this investment or how the transaction was initiated except that he states that he had no knowledge about this Nuveen Fund and received no disclosure documents in respect thereto. These Shares were sold on July 31, 2002. In a telephone conversation on or about June 25, 2003, Cohen proposed that Kastel buy additional shares of Short Term Nuveen Munis for the Trust account. He did not learn the identity of the Fund until he received a confirmation a few days later. On June 26, 2003 Mesirow purchased 15 shares of Nuveen Premium Income 4 series Th for a total of $375,000 for the Trust's account. On August 19, 2003 Mesirow purchased 23 shares of Nuveen PFD & CV F2 TXB for a total of $575,000 for the Trust's account. In a conversation a day or two earlier, Cohen repeated his description of the proposed investment as "short term munis". Kastel as Trustee or otherwise never received any disclosure documents. As of December 31, the 7 shares of Nuveen Mun Opportunity Pfd M were in the Trust account and the Trust had an investment in the three Nuveen Funds totaling $1,125,000. On or about March 2004 Mesirow purchased 12 shares of Nuveen Premium Inc Mun Fd 4 SER W for the Trust Account and 12 shares of Nuveen Insd Prem Inc Mun Ser T for the Trust Account for a total of $600,000. On June 4, 2004 Mesirow sold 3 shares of Nuveen Pfd & Conv Income Pref for a total of $75,000. On November 19, 2004 Mesirow sold an additional 8 shares of Nuveen Pfd & Conv Inc Pref for $200,000. As of December 31, 2004 the Trust account had a total of 58 shares of Nuveen ARPS for a total of $1,450,000. On March 15, 2005 Mesirow purchased 6 shares of Nuveen Mun Mkt Oppty Fd Series T for $150,000. As of December 31, 2005 the trust Account had a total of 64 shares of Nuveen ARPS for a total of $1,600,000. On August 3, 2006 Mesirow purchased 10 shares of Nuveen Insd Prem inc Fd Ser Th for $250,000. In 2006 Mesirow purchased 5 shares of Nuveen Perm Plus Muni Ser Th for the account of Joan Kastel for $125,000. As of

32

December 31, 2006, the Trust account had a total of 74 shares of Nuveen ARPS for a total of $1,850,000 and the Joan Kastel account had a total of 5 ARPS for $125.000. Kastel did not maintain a diary in respect to these purchases and sales. Cohen did not always tell Kastel about these transactions and Kastel would learn of them after he received a confirmation from Mesirow. The confirmations did not disclose any material facts or disclose any risks. Each conversation with Cohen was consistent—there was no risk. Each time Cohen repeated that the shares were short term munis or weeklies backed by assets that were three times the amount of munis outstanding. Cohen never identified the specific fund.

32. On August 17, 2007, Cohen contacted Kastel by telephone at his home in Chapel Hill, North Carolina and suggested in substance: "In view of your move to North Carolina, I am going to put you into Nuveen's North Carolina Funds (never identified which funds) to take advantage of the double tax exemption". During this telephone conversation Cohen did not identify the Nuveen North Carolina tax exempt funds that he was going to buy other than the fact that the interest earned by the funds would not be subject to North Carolina's income tax and that now we were North Carolina residents we should be in North Carolina Funds. Kastel learned later in 2008 that the decision as to which funds to invest in was made by Mesirow's or Nuveen's trading desk in accordance with an undisclosed practice in effect at that time. Kastel believed that Cohen designated the number of Shares to be sold and the funds to be sold and also made the determination as to the funds to be purchased. Kastel learned later that Mesirow treated the Funds were treated as fungible based on the day of the week or their availability. The Shares sold and purchased were held in the Mesirow's name and not the Kastels. Kastel believes that neither Cohen nor Mesirow had a disclosure statement or Prospectus in

33

connection with any of the Nuveen North Carolina Funds. During this conversation, Cohen repeated his description of the safety of the investment by reason of the quality of the underlying municipal bonds that were rated AAA or AA and the preference in the event of liquidation describing the fact the funds were required to own assets that had 3 times the value of the preferred shares and that the investment was short term munis that paid interest slightly higher than muni money market funds. At that time, Kastel described his concerns relative to the safety of another investment that Cohen had purchased for the Trust: Asset Management Fund Inc Adjustable Rate Mtg Fund. At the time the Trust owned 14,339 shares that were sold or redeemed for $138,323.36, which was also invested in Nuveen's North Carolina Funds. As of the date of this conversation, Cohen had repeatedly stated that the Nuveen ARPS (Cohen used the term "Nuveen Munis") were "short term tax free, rolled over and redeemable weekly, a place to park cash and had attractive after tax yields". Kastel was to learn after March 2008, that these statements mirrored Nuveen promotional materials. These statements were false and misleading and relied on by the Kastels. At the same time, Cohen sold or redeemed 11,477 shares of the Asset Management Fund for $110,645.64 that were in Joan Kastel's account. Commencing shortly after this conversation, the following transaction were effected in the Kastels accounts:

Howard L. Kastel Trust

8/20 Sold 7 shares of Nuveen Mun Mkt Opportunity FD Series M $175,000

8/21 Sold 12 shares of Nuveen Insd Premium Income Mun FD Series T $300,000

8/21 Sold 6 shares of Nuveen Mun Mkt Opportunity FD Series T $150,000

8/23 Buy 8 shares of Nuveen NC Prem Income Mun FD Series Th $200,000

8/29 Buy 20 shares of Nuveen NC Divid Adv FD 3 Mun Series W $500,000

8/30 Buy 6 shares of Nuveen NC Prem Income Mun Fd Series Th $150,000

34

9/05 Sell 12 shares of Nuveen Prem Inc Fd 4 Mun  Series W $300,000

9/05 Buy 12 shares of Nuveen NC Divid Fd 3 Mun Series W $300,000

9/06 Sell 12 shares of Nuveen Prem Inc Fund 4 Mun Series Th $375,000


9/06 Sell 10 shares of Nuveen Insd Prem fd 2 Mun Series Th $250,000

9/06 Buy 25 shares of Nuveen NC Prem Income Mun Fd Series Th $650,000

9/07 Sell 12 shares of Nuveen Multi Strategy Income Fd Series F $300,000

9/07 Buy  12 shares of Nuveen NC Divid Adv FD 2 Mun Series F $300,000

      Joan H. Kastel

8/23 Sell 5 shares of Nuveen Perf Municpal FD Series Th $125,000

8/23 Buy 5 shares of Nuveen NC Prem Income FD Series Th $125,000


33.  Deutsche Bank conducted each of the so-called auctions with respect to the
above transactions and together with Nuveen, Merrill Lynch and CitiGroup
managed the auctions knowing that the purchasers (the Kastels) did not receive a
prospectus, supplemental prospectus or disclosure statement and none of risks were
disclosed.  Nuveen and the other Defendants also knew that a "Dutch Auction"
(the Kastels do not recall hearing this term before March 2008) was designed to be
a "blind auction".  To get around this, Nuveen created an unregistered exchange
and limited the members of the exchange to the Underwriter Broker Dealers.  The
Kastels believes that some of the money to purchase the Nuveen North Carolina
Munis came from a money market fund – Federated Prime Cash Series, an
investment selected and monitored by Mesirow.  The Kastels have no recollection
of discussing this with Cohen.  Apparently Cohen made the decision to invest in
these specific funds.  Unlike the Nuveen Funds, the Kastels received periodic
shareholder reports, which described the money market funds.  The transactions

referenced above resulted in 83 Shares of Nuveen North Carolina Funds in the Account of Howard L. Kastel Trust as of October 1, 2007 at a cost of $2,075,000 and 5 Shares of Nuveen North Carolina Funds in the Account of Joan H. Kastel at a cost of $125,000.

34. During the August 17, 2007 telephone conversation when Cohen described his plan to sell the "national" Nuveen Funds and purchase the Nuveen North Carolina Funds, Cohen never said anything about the auction procedures:

      1) the fact that Nuveen could not buy the shares and had to buy them through Nuveen's trading desk; the fact there was no market for the shares other than through the auction controlled by Nuveen;

      2) the fact only certain brokers were party to a "Broker Dealer Agreement" with the Auction Agent;

      3) the fact that the Auction Agent was under a contract with Nuveen;

      4) and that Nuveen controlled the auctions.

Each of the Defendants knew that the Prospectus for each of the North Carolina Funds identified herein contains voluminous detail of the auction process and the risk of auction failure and the fact these were long term securities with no maturity date. In fact, Cohen and Mesirow never described any of the forgoing material facts in connection with the purchase of any Nuveen Funds. To the contrary, because none of the risk factors occurred in connection with the several purchases, sales or redemptions in the past, the Kastels were lulled into a belief that the Nuveen Funds were "actually" safe, liquid short term money market clones. This was demonstrated as recently as the August and September 2007 transactions when Cohen "traded" the national munis for the North Carolina munis. Most importantly Cohen and Mesirow did not disclose any of the material facts relating

36

to the liquidity and risk factors of the Nuveen ARPS. Cohen, Mesirow and Nuveen failed to disclose:

a) The Nuveen ARPS were not short term "weeklies" and "money market like liquid securities", but in fact Nuveen ARPS were long-term perpetual debt instruments without a maturity date;

b) The Nuveen reference to ARPS as "weeklies" was false and misleading;

c) Nuveen's "so-called Dutch auctions" Deutsche Bank were a sham managed by the Underwriter Brokers Dealers who were "Remarketing Agents" for the Nuveen Funds;

d) The "Dutch Auction" was not an auction at all but an arranged, manipulated unlawful private exchange that Nuveen used to sell the ARPS to unsuspecting investors;

e) That certain Broker Dealers were under contracts to act as "remarketing brokers" and paid by Deutsche Bank as Nuveen's agent were "propping up" the auctions to give the appearance of active trading because the "maximum rate was too low to create a real market for the Nuveen ARPS;

f) An affiliate of Nuveen was one of the Remarketing Agents;

g) Underwriter Broker Dealers and Remarketing Agents engaged in price talk before each auction and shared pricing information regarding the number shares and other information that constituted insider information that was unlawful and the subject of an SEC Cease and Desist Order;

h) That auctions could fail and investors would be locked into a long-term illiquid investment at unconscionably low rates with no option to sell, redeem or put there shares;

i)  That the investment in ARPS could not be sold because the default "Max" rate was substantially below market and a result the value of the ARPS would be less than 60% of price paid in the event of a failed auction;

j) That the Funds were not market based funds, that is to say had no basis in market reality and the rates established were not market driven;

k) That as of August 21, 2007 other auctions had failed when Underwriter Broker Dealers stopped supporting the auctions;

l) That Mesirow intended to and did put in Hold orders every  week without communicating with the Kastels;

m) That the underwriter Broker-Dealers placed orders for their own accounts to give the auctions the appearance of an active liquid market ;

n) That the SEC as early as 2004 announced a formal investigation and in 2006 had filed Complaints against the Underwriter Broker Dealers including Merrill Lynch and CitiGroup and the Auction Agent Deutsche Trust Company Americas, and published orders censuring Merrill Lynch and CitiGroup, ordering each of them to  cease and  desist from        further violations of the Securities Act and ordering each of them to pay a civil penalty of $1,500,000 and ordering Deutsche Bank Trust Company Americas     to also Cease and Desist from violations of the Securities Act and pay $750,000.  In connection with the SEC investigation and proceedings, each of the parties had disclosed that they had engaged in the unlawful practices by manipulating the auction market;

o) That the ARPS were not "puttable" in the event of a failed auction;  that only the funds had an option to redeem shares and the ARPS preference existed only in event the funds were liquidated;

p) That Nuveen and the Fund Trustees had conflicts of interest;

q) That Mesirow's Chief Economist Diane Swank believed that by recommending Nuveen's ARPS to its clients, Mesirow was giving "bad advice;

r) That in 2006, the SEC's municipal securities chief Martha Haines in a public address, reported in the Bond Buyer, an important industry publication, that the way rates were set on auction rate securities bore little resemblance to the way the process was described in offering statements or the kind of Dutch Auctions known to most investors;

s) That as a result of insufficient investor participation at the auction, as orchestrated by Nuveen and the Underwriter Broker Dealers, the defendants were able to assert almost complete control over the rates of interest paid on Nuveen's ARPS;

t) That the remarketing scheme that was sponsored by Nuveen and Deutsche Bank required the issuance and distribution of a Prospectus, which Nuveen and the defendants knew, would cause the market for to dry up;

u) That in the event the auctions failed the Defendants would continue to pay themselves hundreds of millions of dollars in fees;

v) The risks were the same as being in one fund and made the concentration of the investment much greater;

w) Nuveen had no plan to redeem illiquid ARPS by causing the funds to sell assets;

x) The Nuveen Funds had no liquidity backstop which would allow investors to redeem shares at par and that the ARPS preference was not operative if the Funds froze;

y) That the Trustees of the Funds were in reality controlled by Nuveen, protected the interests of the Common Shareholders and the so-called

39

Trustees elected by the ARPS shareholders did not sit on the Board in a representative capacity.

Each of the Defendants knew that the Kastels and other investors in the Nuveen ARPS believed that were investing in short term liquid shares. Under the direction of Nuveen the Defendants intentionally and willfully deceived the Kastels and other investors. The foregoing statement and omissions were material and were intended to deceive the Kastels. The Kastels justifiably relied on the Defendants' misrepresentations and omissions. If the Kastels had known the true facts they would not have permitted the Nuveen Funds to be purchased for their accounts.

35. Mesirow and Nuveen did not disclose any of the risk factors and unlawful practices to the Kastels at the time of these transactions. Mesirow and Nuveen also did not disclose that their officers and employees and the Trustees of the Nuveen Funds had various conflicts including, but not limited to, the ownership of Common Shares of the Nuveen Funds. These conflicts of interest existed because the Common Shares benefited from the leverage created by the artificially low rates paid to the ARPS investors. On February 15, 2008, Cohen first disclosed this conflict of interest to Howard Kastel. Mesirow and Nuveen also knew that the effect of setting the dividend rates below fair market rates, and the prospect of low "maximum rates" that would result from a failed auction had alienated institutional and other sophisticated investors. This lack of market interest resulted in an accelerated propping up of the auctions by the Underwriter Broker Dealers. The reality was the Auction process had already failed because Nuveen and Underwriter Broker Dealers, assisted by Deutsche Bank created a false market for the purpose of intentionally deceiving investors. The artificially

40

low rates also deprived the Kastels and other investors from receiving the return of on their investments that they would have received absent the interference and manipulation orchestrated by Nuveen and the Underwriter Broker Dealers. Mesirow and Nuveen had knowledge and information that certain auctions had failed prior to August 23, 2007 and that the risk of auction failure had increased and continued to increase in late 2007 and January 2008. By January Nuveen had knowledge of auction failures involving the Nuveen Funds and the pending failure of more Nuveen Fund auctions that would result from Lehman Brothers' decision to discontinue propping up the Nuveen ARPS auctions as of, on or about, February 13, 2008. By January 2008 the date for the collapse of the ARPS market had been set. Lehman Brothers withdrawal of support triggered the simultaneous withdrawal by other Underwriter Broker Dealers. On January 28, 2008, 16 days before the Auction Market collapsed, Nuveen met with Merrill Lynch to discuss a proposal that Merrill Lynch serve as a replacement for the $2.4 billion that was managed by Lehman. Nuveen and Merrill knew that the Lehman withdrawal was timed for, on or about, February 14, 2008. In fact, Lehman Brothers withdrew and the market collapsed on February 13. Nuveen's Underwriter Brokers Dealers had a plan and implemented it by their parallel conduct thereby freezing the ARPS held by the Kastels and thousands of other individual investors.

36. Mesirow knew as early as 2006 that the Auctions were managed to give the appearance of active trading and that without the support of the Issuer Broker Dealers (Merrill Lynch and CitiGroup) who entered into agreements with Deutsche Bank and Nuveen the auction would fail. Mesirow and all of the Defendants knew that the artificially low level of "maximum rates" payable in the event of a failed auction was statistically significant as a determinant of the likelihood of auction

41

failure. This was another material fact not disclosed to the Kastels. Hence, the auctions did not fail solely because the Underwriter Broker Dealers withdrew there support, the auctions failed because Investors did not have a right to "PUT" their shares to the funds and because the "Maximum rate" was set so low no person with a reasonable understanding would ever buy at the auction. None of these material facts were disclosed. They were intentionally not disclosed making what was disclosed false.

37. As enumerated in detail in this Amended Complaint each of Defendants acted with a shared perfidious purpose in the conspiracy. Each of the Defendants knowingly and intentionally played an active role in the deception perpetrated on the Kastels. Each of the Defendants knew of and intended to participate in the fraud. Each of the Defendants (except Cohen and Mesirow) were parties to written and oral agreements and understandings. These agreements formed the framework for the scheme and constituted a civil conspiracy. The Defendants conduct is detailed in the complaints and orders issued by SEC and form a strong inference that each of the parties knew of the fraudulent scheme and intended to participate in the fraud. Each of the Defendants acted with particular state of mind with respect to each act or omission alleged here. In engaging in this conspiracy, the Defendants believe they were too big to get caught. North Carolina was the place where the injuries occurred; thus each of the Defendants has submitted to the Jurisdiction of this court.

38. As Broker Dealers, Mesirow and Nuveen were in the business of gathering information regarding these transactions and communicating information that would have put the Kastels on Notice of the warnings and risks, including the risk

that the ARPS market could stop functioning, thereby locking up innocent investors money.  This information was known in the securities business since 2004 or earlier.

39.  The Kastels' relationship with Mesirow was based on faith, trust and decency. Mesirow breached its duty of trust by knowingly misleading the Kastels in connection with their purchase of the Nuveen ARPS.  Cohen knew that in his relationship with the Kastels, neither he nor Mesirow provided disclosure documents, a pattern of conduct that Mesirow followed in its relationship with others. Mesirow had a pattern of misleading their customers to induce them to purchase Nuveen Closed End Muni Funds.  As late as January and February 2008, days before the auction market collapsed, Nuveen Shares were purchased for the accounts of Customers who believed that the Nuveen Closed End Funds were short term money market  or weekly shares that rolled over like CDs if the customers did not redeem them.  Mesirow had a pattern and practice of describing these investments as AAA and AA rated ultra short term bond funds.  Liquidity issues were not disclosed.  Larry Cohen knew that the Kastels were risk adverse and considered the Nuveen ARPS as cash-like investments.  Larry Cohen intentionally encouraged Kastel to focus on the safety of the underlying municipal securities. Mesirow and Nuveen had a fiduciary duty of utmost good faith and loyalty to the Kastels and to recommend an investment only after careful study of the risks. Mesirow and Nuveen has a continuing duty to disclose all of the risks, to refrain from self dealing and to refrain from misrepresenting any material fact in respect to the ARPS.  By not selling or redeeming the ARPS each week, Mesirow and Nuveen were "placing orders to Hold the ARPS".  In substance and fact,  Mesirow and Nuveen "bought" the ARPS each week by not selling or redeeming the shares.

Hence, each week Nuveen, as Sponsor, and the Nuveen Funds, the underwriter Broker Dealers and Deutsche Bank, were remarketing the ARPS without a Registration statement and without providing any disclosure statement as required under the securities laws. Moreover, Mesirow knew that the Nuveen North Carolina Funds were not a suitable investment for the Kastels. Although the Kastels' monies were invested in three separate Nuveen Funds, these funds carried a common risk and an overly concentrated investment that increased an already great and undisclosed risk. The ultimate breach of duty committed by Mesirow and Nuveen was the breach of trust and both are guilty. The Kastels justifiably relied on Mesirow's Misrepresentations. Larry Cohen and Mesirow knew the Kastels' goals and objectives were focused on liquidity and minimal risk. Mesirow not only acted as the Kastels Investment Adviser, but Mesirow, for years, acted as the Kastels' insurance agent and adviser.

40. Starting in about early November 2007 and continuing until January 2008, Howard Kastel contacted Cohen by telephone with concerns related to the Nuveen investments. These concerns were prompted by newspaper articles referencing problems with some of the insurance companies that insured the quality of the certain underlying investments held by the funds and the effect on the credit worthiness of the Funds. On at least four dates in December and January, Howard Kastel talked to Cohen and received repeated reassurance as to the safety of the ARPS because of their so-called 300% preference on liquidation. Unknown to the Kastels, Cohen had become concerned as a result of his knowledge of the liquidity risk and questions with regard to the continued support of the Auctions. As a result of these concerns, Cohen contacted Nuveen in about November 2007 with respect to these concerns. He never advised the Kastels of his concerns or the

increased risk of a market collapse and the potential freeze up that ultimately did occur in February 2008.  Meanwhile Mesirow, Nuveen and the other defendants continued to be paid huge fees on a monthly basis in respect to the Nuveen Funds.

41.  On February 15, as the auction market collapsed, Cohen sent an email at 9:52 AM to Nuveen at the same time that Mesirow and Nuveen were submitting HOLD orders for the Kastel Trust.  The email read in pertinent part:  "I'm Shocked", Cohen continued "As an advisor and a shareholder in both the ARPS (several million of my own money) and common stocks of your funds Nuveen has not uttered a word about this crisis." " Nuveen has a conflict in that it has two constituencies—the preferred and common shareholders…"  "The preferred shareholders accepted the liquidity risk.."  "My view is that the funds should borrow money and offer liquidity to the preferred shareholders who want to redeem."  To the extent the statement that the quotation "Preferred Shareholders accepted the liquidity risk" relates to the Kastels,  the statement is false.

42.  Mesirow had a pattern of misleading their customers in order to induce them to purchase Nuveen ARPS.  In addition to placing HOLD orders for the Kastel's accounts, as late as January and February 2008, days before the auction market collapsed, Nuveen ARPS were purchased for accounts of customers who specifically stated in writing that their money was to be invested in short term money market funds and who believed that Mesirow had put the money in liquid short term money market funds.

43.  Mesirow had a pattern of focusing their clients  attention on the Nuveen Funds AAA and AA ratings.  Cohen consistently focused on the safety of the

underlying municipal securities and the ARPS shareholders preferred position. Liquidity issues were not disclosed. Cohen and other Mesirow advisers knew that the Kastels and other clients were risk adverse and on the basis of statements by Cohen and other Mesirow Investment Advisers believed that the Nuveen ARPS were cash-like investments. For the minuscule return on their investment, no person would have been stupid enough to invest their money knowing what Cohen knew and did not disclose.

## The Unlawful Exchange

44. For several years Nuveen sponsored and Deutsche Bank conducted an unregistered Securities Exchange, as that term is defined in the Exchange Act, in violation of that Act. The other Defendants and other designated (by Nuveen) large Underwriter Broker-Dealers, including Nuveen were members of this unlawful exchange. This unlawful Exchange, operated by Deutsche Bank pursuant to written agreements between Nuveen and Deutsche Bank, engaged in unlawful practices that included artificially supporting and manipulating the so-called auction market to maintain the appearance of liquidity and stability. Each of the Defendants knew that the ARPS were not listed on an Exchange regulated by the SEC and that the DBTCA auctions were secret and not transparent. Each of the Defendants knew that the ARPS would become illiquid as soon as Merrill Lynch, Citigroup and Bank of America, along with other undisclosed Broker-Dealers known to Nuveen and Deutsche Bank, stopped maintaining and supporting the market. The Exchange, which was established as part of the scheme, was a private organization sponsored by Nuveen with membership only open to Broker Dealers designated by Nuveen and the Nuveen Funds. The unlawful Exchange did not

46

have the safeguards required of exchanges registered with the SEC. This unregistered Exchange operated an opaque process without any oversight. The exchange permitted its participants to favor themselves over non-member brokers. The exchange had a central facility and a limited membership and was designed to give a false appearance of active trading. In addition to operating an unregulated unlawful Securities Exchange, Nuveen and Deutsche Bank were, in effect reissuing the shares that were being sold on the Exchange. They were "remarketing" the shares (in the nature of Treasury shares) without a registration statement and without delivering a prospectus or disclosure statement right under the SEC's nose. In substance, the so-called auction, sponsored and managed by Nuveen, constituted a continuous offering of the ARPS through affiliates and underwriters. Under the securities laws, the participants were obligated to deliver an amended or supplemental prospectus to the Kastels and other innocent purchasers. Nuveen and the participants failed to delivery any disclosure statements. Alternatively, because of the remarketing scheme, the ARPS were not, in fact or substance, closed end funds. Each time an auction was conducted the shares were remarketed.

45. Moreover, the auction was not even an Auction. It was a managed process that permitted the Participants, including Defendants Nuveen, Deutsche Bank, Merrill Lynch, CitiGroup, and others national broker dealers, to secretly game the system and control the rates. The so-called auctions were "arranged" transactions that involved Broker-Dealers who had acted Underwriters secretly supporting the market. The Defendants knew that in a true "Dutch Auction" no bidder has knowledge of the bids submitted by other bidding thus protecting the auction process from manipulation and ensuring that the price set is truly reflective of the

market.  The defendant's unlawful practices were pervasive and intentional.  Like all wrongdoers who prey on the innocent, they didn't expect to get caught.

46.  Nuveen and Mesirow had actual knowledge that Investors did not receive a Prospectus or other disclosure information at the time of purchases.  Nuveen knew that Mesirow and other downstream broker dealers were marketing the ARPS as short-term cash equivalents—a place to safely park an investor's money.  Nuveen never intended that the risks of illiquidity be transparent to individual investors.

The Ponzi Scheme

47.   By utilizing the fiction of a "Dutch Auction", Nuveen and the so-called Nuveen Closed End Funds sponsored a process that enabled it to transfer the ARPS to unsuspecting individual investors without any disclosures.  This process was a sophisticated "Ponzi Scheme" where new investors were enticed by Mesirow and other downstream brokers to purchase ARPS. This scheme permitted Nuveen and the other Underwriter Broker-Dealers to siphon off large fees.  Like any Ponzi Scheme, the perpetrators required new investors to bring in new money to pay off the old investors and keep the cycle going.  The plan and process was part of their unlawful conspiracy. Nuveen and the Underwriter Broker-Dealers knew that to keep the Scheme going they needed a constant flow of new money. Notwithstanding, Mesirow and the downstream broker dealers had independent obligations to know and understand the investments securities being sold to their clients. Nuveen assumed its reputation would lull investors into a state of complacency. Nuveen knew that most investors had no information regarding the risks.  Nuveen, and, Robert Bremner and the Nuveen Funds' Board of Trustees,

48

knew that downstream broker dealers were marketing Auction Rate Securities as "the conservative's conservative" investment. Because Nuveen was the co-broker in connection with Mesirow transactions, Nuveen had the same obligations to Mesirow's customers.

48. Nuveen's Scheme was propped up for years. By 2006 Nuveen, Deutsche Bank and the Underwriter Broker Dealers knew the auctions would fail but for the undisclosed support that was escalating the risks of a melt down. Nuveen's ARPS were superficially liquid for as long as Nuveen could rely on the Underwriter Broker Dealers to prop up the auction markets. Nuveen also knew that the Underwriter Broker Dealers took the position that they were not under any legal obligation to continue propping up the market and intended to do so only as long as they deemed that was profitable. Like all "confidence game" participants, each of the Defendants had the appearance of law-abiding members of the investment banking community, but each of the Defendants had a role to play in respect to the commission of Nuveen ARPS fraud. The participants created an intricate and exotic web, but clearly what they structured was an elaborate Ponzi Scheme with the Kastels two of the victims. Even the Registration statements filed with the SEC were intended to hide the true risks—the complexity of it all was like a "fan dancer" covering up the true picture. The Scheme was like a conveyor belt that dumped $billions of ARPS on unsuspecting investors. Using a toxic mix of obfuscation and confusion engineered by their lawyers, some of whom had worked for the SEC, Nuveen engaged in sophisticated trickery to avoid disclosure.

49. Starting sometime in 2007, the exact time of which is known to Nuveen, Deutsche Bank and the Underwriter Broker Dealers, the members of the

49

unregulated Exchange, devised a secret plan to sell off the shares they held and to stop propping up the market, thereby rendering the Nuveen ARPS held by the Kastels and other Nuveen Investors illiquid. By reason of the February 2008 freeze, Nuveen no longer needed the continuous flow of new funds. It had locked the Investor's money and frozen the ARPS owned by thousands of individual investors. As a result of the Ponzi Scheme and the "so called" maximum rate provided for in the undisclosed risks, the perpetual ARPS pay only a fraction of what would be an appropriate rate of return for a similar security.

50. The Ponzi Scheme constitutes "Theft by Deception" and "Obtaining Property Under False Pretenses" as stated or provided in North Carolina General Statutes Section 14-100. Nuveen and the Nuveen North Carolina Funds are treating the ARPS money as a windfall. As of 2008 the ARPS issued by Nuveen Closed End Funds generated roughly $1 billion in fees. Nuveen has always intended to treat the ARPS as equity securities. According to Nuveen's Chief Administrative Officer (Earnings Call Transcript March 3, 2008): "...there is $15 billion, roughly 55 to 60 basis points…the preferred securities related to our closed-end funds are perpetual; they're equity securities, so there is no maturity related to those shares…there's no contractual need to de-lever on a maturity in the security." Mesirow aided and abetted this scheme by failing to properly investigate the risks and by not informing the Kastels and other investors of the risks and unlawful practices. Mesirow by reason of this conduct is guilty of Fraud and Negligent Misrepresentation.

51. Auction Rate Securities represented an ingenious attempt to make a square appear to be a circle: to create a complex funding instrument that appeared to be

long-term from the perspective of the borrowers, the Nuveen Municipal Funds and specifically, the North Carolina Municipal Funds that the Kastels invested in, but short-term from the perspective of the lenders. After February 2008, the unsuspecting ARPS investors discovered what Nuveen, Deutsche Bank and the Defendant Underwriter Broker Dealers knew, that: SUCH AN ARRANGEMENT WAS IMPOSSIBLE. If a funding instrument is long-term for one party, it must be long-term for the counterparty; any appearance to the contrary must be an illusion." (Chicago Fed, The Federal Reserve of Chicago Letter Number 256 dated November 2008)[Emphasis added]

52. Nuveen created the "illusion" that the "ARPS … had a long history and a widespread reputation as both providing attractive after-tax returns and being highly liquid". (Letter on behalf of certain Nuveen ARPS Funds filed with SEC by its Counsel on July 27,2009). The illusion was further advanced by Nuveen's ARPS marketing materials which stated "Nuveen Munipreferred, A Great Place for Short Term Money". The materials contained limited, but nevertheless misleading and incomplete disclosures that were, on information and belief, seen by few investors and were discovered by the Kastels on March 11, 2009. Days before Mesirow invested almost all the Kastel moneys in the Nuveen North Carolina ARPS, an advisory issued by a leading Financial Group published a warning that Auction Rate Securities "the slight yield advantage available today does not merit the INHERENT RISKS…." (SVB Financial Group Advisory date August 15, 2007. The Kastel discovered this Advisory in 2009.

53. Since March 2008, Nuveen has also engaged in a further Scheme to lull its ARPS Municipal Fund Investors and the SEC and other regulatory agencies into

believing that it had a plan to redeem all of it ARPS.  Nuveen has been issuing press releases and statements that it is doing all it can to redeem all of its municipal ARPS.  The true facts are that Nuveen intends to do nothing that will reduce the leverage of its common shareholder or reduce the fees it pays itself for managing the funds.  On or about July 25, 2008 the Kastel Trust received a confirmation that one share of Nuveen NC Div Adv Pfd Series F had been sold for $25,000.  On or about June 5, 2009, Nuveen redeemed two Shares held by the Howard L. Kastel Trust of Nuveen NC Prem Inc Pfd Series Th for $50,000.  At the time of this redemption, the account still held 80 ARPS shares.  The redemption represented less than 3% of the Kastel frozen ARPS. In response to a statement by Kastel "that at this rate I will have to live to 110 to get my money back", a Mesirow Investment Advisor stated that the redemption was a one-time occurrence and Mesirow has no definitive plan to redeem any more of the Kastels' ARPS shares.  At that time, none of Joan Kastel's shares had been redeemed.  The lack of a definitive plan was confirmed in a Nuveen letter to Howard Kastel dated July 17, 2009:  "We understand your frustration regarding the fact that to date only a portion of your ARPS have been redeemed and that WE CANNOT PROVIDE YOU WITH A SPECIFIC TIMETABLE AS TO WHEN AND IF YOUR REMAINING ARPS WILL BE REDEEMED".

54.  This suit was originally filed in August 2009. After the lawsuit was filed, Nuveen Redeemed the following Shares of ARPS:  February 17, 2010  18 shares of Nuveen NC Premium Income Series Th  for $450,000 held by the Trust and 3 shares of Nuveen NC Premium Income held by Joan Kastel for $75,000.  On February 24,2010 Nuveen Redeemed one share of Nuveen NC Prem Income held by the Trust for $25,000.  March 2, 2010 Nuveen Redeemed 32 shares of Nuveen

NC Divid Adv Mun Fd Pfd Ser W held by the Trust for $800,000. In April 2010, 11 shares valued at $275,000 of Nuveen North Carolina ARPS held by the Trust were redeemed. Eighteen shares held by the trust valued at $450,000 and 2 shares valued at $50,000 held for the account of Joan Kastel have not been redeemed for a total of $500,000. Nuveen has announced that it has postponed indefinitely the redemption of said shares. The current rate of interest paid on the balance of these Long Term Preferred Shares is one quarter of one per cent.

55. Incredible as it appears, Nuveen has redeemed Nuveen North Carolina ARPS held by Defendants Deutsch Bank, Merrill Lynch, Bank of America, CitiGroup and other broker-dealers who participated in Nuveen's unlawful scheme.

## LOSS CAUSATION/ECONOMIC LOSS

56. As alleged above, Defendants engaged in a scheme and course of conduct to sponsor, create, maintain, prop up and perpetuate, for their own benefit, an artificial market for Nuveen North Carolina ARPS in order to inflate the perceived value of these securities and all Nuveen ARPS and to generate underwriting fees, auction management fees, trail fees and other fees to the detriment of innocent investors including the Kastels. This Scheme and course of conduct operated as a fraud and deceit on Plaintiffs, by omitting to disclose material foreseeable risks concerning the market for sale and redemption of the ARPS and the value and liquidity risks of these investments. The materialization of the risks concealed from the Kastels was foreseeable. These risks materialized when the auction market collapsed on February 13, 2008. The Defendant knew that the ARPS auction market would collapse at the time the Underwriter Broker Dealers,

53

specifically Nuveen, Merrill Lynch, Citigroup and Deutsche withdrew their support and the fraud became apparent to the investing public. Materialization of these risks and their subsequent disclosure, directly or proximately, caused the damages sustained by the Plaintiffs.

57. But for the Defendants wrongful, fraudulent and deceptive conduct, the interest and dividend rates before and after the February 2008 auction collapse would have been substantially higher than what the Plaintiffs received for the Nuveen ARPS that they purchased since 2003, including the Nuveen North Carolina ARPS. The Defendants deceptive conduct caused the interest rates to be artificially low, considerably lower than the rates that the market would have placed on them had the investing public been aware of the true characteristics and risks of the Nuveen ARPS. Given a higher interest rate, the Kastels would have received higher dollar amounts of interest and would have been able to purchase the ARPS at lower rates sufficient to compensate for the lack of liquidity and other undisclosed risks. Time and money go hand in hand. The Defendants know that receiving less than a market rate on interest for years is a loss. The Defendants are in the money business. The damages the Plaintiffs suffered includes the loss of interest and the reduction in value of the ARPS as measured by loss in value by reason of the low interest rate and perpetual term as of the date of purchase.

58. As a result of the concealed risks, the Defendants received huge and excessive fees and unconscionably high income and profits that they should be required to disgorge.

59.  As a result of the materialization of the concealed risks, the perceived value of the ARPS has declined substantially.  Finally, the interest paid to the Kastels is fraction of the interest sufficient to compensate the Kastels for the lack of liquidity and other risks inherent in the securities.

## COUNT I
## DECLARATORY JUDGEMENT AGAINST MESIROW

60.  The Kastels repeat and reallege the allegations set forth in Paragraphs 1 through 59 above as if set forth herein.

61.  An actual justiciable controversy exists between the Kastels and Mesirow concerning whether said Defendants have an obligation to repurchase the Kastel's ARPS.

62.  That the claims set forth herein are not subject to an Agreement to Arbitrate and That Mesirow has an obligation to repurchase the ARPS purchased for the Kastels. Accounts and ordering Mesirow to repurchase said ARPS.

## COUNT II
## BREACH OF FIDUCIARY DUTY AGAINST
## MESIROW AND NUVEEN

63. The Kastels repeat and reallege the allegations set forth in the paragraphs above as if set forth herein.

55

64.  The Kastels placed trust and confidence in Mesirow Financial based upon their reputation.  By reason of Nuveen acting as co-broker and sharing the fees paid in respect to the Kastels' ARPS shares they are liable along with Mesirow Financial for and in respect to said breach.  The Kastels reasonably relied on the purported expertise of Mesirow Financial in bestowing trust and confidence in Mesirow Financial.

65.  Mesirow Financial accepted responsibility and the trust and confidence of the Kastels and thereby assumed a fiduciary duty to the Kastels.   Mesirow Financial breached its fiduciary duty to the Kastels by investing in the ARPS that did not comply with the Kastel's stated investment goals and objectives.  Mesirow Financial and Nuveen Investments breached their fiduciary duty by intentionally misleading the Kastels into believing that the ARPS were safe and liquid.

66.  The Kastels have suffered and will continue to suffer damage and financial loss as a result of Mesirow Financial and Nuveen Investments breaches of duty.

COUNT III

VIOLATIONS OF SECTION 10(b) OF THE

EXCHANGE ACT AND RULE 10 (b) 5 ALL DEFENDANTS

67.  The Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if set forth herein.

56

68. From February 2003 to February 13, 2008 the Defendants employed manipulative and deceptive devices in violation of Rule 10b-5 promulgated by the SEC, which devices were intended to and deceived the investing public, including the Kastels enabling the Defendants to sell $millions of ARPS to the Kastels including $2.2 million of the securities of the Nuveen North Carolina Funds on which the Defendants made substantial fees and commissions and caused the Kastels to purchase overvalued ARPS from the Defendants including Mesirow And Nuveen.

69. Defendants, jointly and severally (and each of them) engaged in a scheme to defraud and made untrue statements, in light of the circumstances under which they were made, misleading, in violation of Section 10 (b) of the Exchange Act and Rule 10b-5.

70. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

71. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentations of interstate commerce and/or of the mails, engaged and participated in a comprehensive scheme to defraud and a continuous course of conduct to conceal adverse material information about auction rate securities.

72. The information that Defendants failed to disclose to the Kastels was material information and altered the total mix of information about ARPS made available.

73.  Defendants employed manipulative and deceptive devices and contrivances, while in the possession of material adverse information, and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure the Kastels that the ARPS were substantially the same as cash and were highly liquid, safe short-term investment vehicles suitable for the Kastels.

74. Defendants had actual knowledge of the misrepresentations and omissions of material facts or acted with deliberate and intentionally disregarded the truth..  Defendants made the material misrepresentations and/or admissions hereinabove describe for the purpose and effect of (a) concealing the truth about the value, liquidity and risks of the ARPS and (b) supporting the overvalued price and low interest rates for the ARPS.

75.  If Bremner or Mesirow did not have the actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge and refraining from taking steps necessary to discover that those statements were false and misleading.  As a result of the dissemination of the materially false and misleading information the interest rates paid in respect to the ARPS were artificially low and the prices artificially high.

76.  At the time of the misrepresentations and omissions, the Kastels were ignorant of their falsity and believed them to be true.  The Kastels acted with due diligence, did not act with recklessness and could not have discovered the true facts that Defendants misstated and or failed to disclose.

77.  By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

COUNT IV

VIOLATION OF SECTION 20 (A) OF THE EXCHANGE ACT AGAINST ROBERT P. BREMNER, CHAIRMAN OF THE NUVEEN FUND BOARD

78.  The Kastels repeat and reallege the allegations set forth in the paragraphs above as if set forth herein.

79. Bremner acted as controlling person of the Nuveen North Carolina Funds within the meaning of Section 20(a) of the Exchange Act for reasons alleged in this Complaint. By virtue of Board's statutory responsibility and management control of the Nuveen North Carolina Funds business and involvement in the business and conduct of the Nuveen North Carolina Funds, Bremner and the Board had the power to influence and control and did influence and control, directly or indirectly, the decision making and actions of the Nuveen North Carolina Funds.  Bremner and the Board had the power to cause the Funds to discontinue the unlawful practices that Nuveen Investments had instigated and promoted.  Bremner had the power, along with other Board members, to stop the Funds participation in the Ponzi scheme.  By virtue of his position as a controlling person he liable pursuant to Section 20(a) of the Exchange Act.

COUNT V

59

## FRAUD BY ALL DEFENDANTS EXCEPT BREMNER

80. The Kastels repeat and reallege the allegations set forth in the paragraphs above as if set forth herein.

81. All of said Defendants, and each of them, acted in concert and made material misrepresentations or omissions to the Kastels and other investors in the Nuveen North Carolina Funds with knowledge that those misrepresentations or omissions would be justifiably relied upon by the Kastels in connection with the Kastels decision not to sell the Nuveen North Carolina ARPS prior the time that the auction market process collapsed in February 2008. All of said defendants participated in the operation of the unlawful exchange and the Ponzi described herein and engaged in manipulation and other legal acts and liable to the Kastels and other individual investors in the Nuveen North Carolina Funds.

82. Mesirow and Nuveen, and each of them, provided the Kastels with false information regarding the liquidity of the ARPS and failed to disclose other information that led the Kastels to believe the Nuveen North Carolina ARPS investments conformed with their stated investment goals although Mesirow knew and Nuveen is charged with knowing, as co-broker, that the illiquidity of the ARPS did not meet said investment goals.

83. That the Kastels justifiably relied upon Mesirow's and Nuveen's misrepresentations and omissions of material fact leading to the Kastel suffering damages and financial loss.

84. The Kastels were damaged by the unlawful acts participated in and perpetrated by said all of the Defendants.

## COUNT VI
### NEGILGENT MISREPRESENTATION AGAINST
### MESIROW AND NUVEEN

85. The Kastels repeat and reallege the allegations set forth in the paragraphs above as if set forth herein.

86.  Mesirow and Nuveen had an affirmative duty to provide the Kastels with all the material information regarding risks associated with the Nuveen North Carolina ARPS investments, Nuveen's role in sponsoring the ARPS auction process and risks associated with the potential collapse of the ARPS auction process.

87.  Mesirow and Nuveen did not exercise due care in obtaining or communicating information to the Kastels.  Mesirow and Nuveen negligently made material representations in the course of their business as stated above and knew or should have known that their representations were false.

88. Mesirow and Nuveen made these representations with the intent that the Kastels would be induced to act and the Kastels justifiably relied leading the Kastels to suffer damages and financial loss.

## COUNT VII

RESCISSION AND RELATED RELIEF UNDER THE ILLINOIS
ACT 815 ILCS 5/1, et seq. AGAINST MESIROW, NUVEEN
AND DEUTSCHE BANK

89. The Kastels repeat and reallege the allegations set forth in the paragraphs above as if set forth herein.

90.  Mesirow, Nuveen and Deutsche Bank violated the Act by:

    a.  engaging in transactions, practices and a course of business in connection with the sales of Nuveen North Carolina ARPS which worked a fraud or deceit on the Kastels;

    b.  obtaining money through the sale of Nuveen North Carolina ARPS by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

    c.  employing devices, schemes and artifices to defraud the Kastels in connection with purchase of the Nuveen North Carolina ARPS; and

    d.  offering and selling Nuveen North Carolina ARPS in noncompliance with the Illinois Securities Act.

91.  Mesirow, Nuveen and Deutsche Bank are securities dealers;

92.  The Kastels properly and timely exercised their right to void and rescind their Nuveen North Carolina investments.

93.  Mesirow, Nuveen and Deutsche Bank have failed and refused to return the monies paid by the Kastels.

62

94.  Mesirow's, Nuveen's and Deutsche Bank's actions constitute a violation of the Illinois Securities Act, 815 ILCS 5/1, et seq.

95.  Mesirow, Nuveen and Deutsche Bank are jointly and severally liable to the Kastels for the full amount paid together with interest from the dates of payment at the rate of 10% less any dividends paid by the Nuveen North Carolina Funds to the Kastels together with reasonable attorneys fees and costs as provided in the Act.

COUNT VIII

RESCISSION AND RELATED RELIEF UNDER
NORTH CAROLINA STATUTES SECTION 78A-56
AGAINST MESIROW, NUVEEN AND DEUTSCHE BANK

96. The Kastels repeat and reallege the allegations set forth in the paragraphs above as if set forth herein.

97.  Mesirow, Nuveen and Deutsche Bank violated the Securities Act of North Carolina and specifically Section 78-56 by selling Nuveen North Carolina ARPS to the Kastels by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98. The Kastels did not know that the statements made were untrue or contained omissions of material facts.

99. Mesirow, Nuveen and Deutsche Bank acted willfully and materially aided each other in making said statement omissions.

100. The Kastels have made timely demands to recover the monies paid by certified mail addressed to said Defendants.

101. No offer to  repurchase the ARPS has been made by said Defendants

COUNT IX

THEFT BY DECEPTION AND OBTAINING
PROPERTY BY FALSE PRETENSES BY ALL OF
THE DEFENDANTS

101.  The Kastels repeat and allege the allegations set forth in the paragraphs above as if set forth herein.

102.  A person is guilty of theft by deception if it, he or they intentionally obtain or withhold property of another by deception.  All of the Defendants are persons under the law.  The Defendant Bremner is sued as the Chairman of the Board of the Nuveen Funds.  Bremner and the Board permitted the Funds to obtain the Kastel's and other individual investors money under False Pretenses.

98.  The Defendants knowingly, and by means of false pretense, obtained from the Kastels monies in their accounts at Mesirow with the intent to cheat and defraud the Kastels.  The amount of said property is more than $300,000 and constitutes a felony under North Carolina General Statute Section 14-100.  The

64

Defendants have failed to correct their deception and return the monies wrongfully taken.

103.  The Defendants  actions constituted a Tort under applicable law.

## COUNT X
## COMMISSION OF THE TORT OF INTENTIONAL OR NEGILGENT INFLICTION OF EMOTIONAL DISTRESS BY MESIROW, NUVEEN AND THE NUVEEN NORTH CAROLINA FUNDS

104. The Kastel repeat and reallege the allegations set forth in the paragraphs above as if set forth herein.

105.  A person or corporation is guilty of the Tort of intentional infliction of emotional distress by reason of extreme and outrageous conduct, which is intended to cause and does in fact cause severe emotional distress.

106.  It was reasonably foreseeable that the wrongful conduct of said Defendants that continues to this would cause severe emotional distress to the Kastels and to other innocent investors in Nuveen Fund ARPS.

107,  These Defendants compounded this tortuous conduct by repeated suggesting they had a plan to redeem Plaintiffs when knew that, at the time

65

statements were made, that the statements were false and misleading and would cause the Kastels to have false hopes that they would be made whole.

108.   The Defendants further compounded this tortuous conduct by repeatedly suggesting that the Kastels be patient notwithstanding that they would not agree to redeem the Kastels ARPS in the Kastel's lifetime and that the Kastels would have to abandon their retirement plan.

109. The Kastels' allegation of Fraud, Theft by Deception and Obtaining Monies by False Pretenses, continues after 2 years  since the ARPS collapsed and Mesirow's refusal to Funds refusal to rescind the fraudulent ARPS transaction and Nuveen and the Nuveen Funds refusal to redeem the Kastels' ARPS constitute evidence of the extreme and outrageous conduct that is the basis of this claim.

106. The conduct of Mesirow, Nuveen and the Nuveen Funds constitutes a Tort under applicable law.

 WHEREFORE, The Howard L. Kastel Trust and Joan H. Kastel pray for:

    A. Judgment against Mesirow Financial Inc and Nuveen Investments Inc on Count I of this Complaint as follows:

        1.  Declaring that the claims against Mesirow Financial are not subject to Arbitration;

        2.  Declaring that Mesirow Financial and Nuveen Investments are jointly and severally liable to repurchase or cause the Nuveen North Carolina Funds to redeem the ARPS purchased by the Kastels;

3.  Ordering Mesirow Financial and Nuveen Investments Inc to repurchase or cause the Nuveen North Carolina Funds to redeem the ARPS purchased by the Kastels;

4.  Awarding the Kastels interest and costs and  attorney's fees and such   further relief as the Court deems just and proper.

B.   Judgment against Mesirow Financial and Nuveen Investments Inc as follows:

1.  Declaring the Cash Account Agreement executed individually by Howard L. Kastel, Dated August 15, 1989, void and unenforceable;

2.  Rescinding the Client Agreement between Joan H. Kastel and Mesirow Financial and returning the funds that the Kastels entrusted to said Defendants;

3)  Disgorging all profits earned by Mesirow and Nuveen through the purchase and sale of the North Carolina ARPS;

4)  Awarding Compensatory and Punitive and Exemplary Damages;

5)  Awarding pre and post judgment interest;

6)  Awarding the Kastels reasonable attorney fees and costs and

7)  Awarding the Kastels such further relief as the Court deems just and proper.


C.   Judgment against all Defendants for violations of Section 10(b) of the Exchange Act and Rule 10(b)5 against all Defendants as follows:

1) Awarding the Kastels damages not limited to rescission, recessional damages, restitution, disgorgement of ill-gotten gains and profits. compensatory and punitive and exemplary

67

damages as provided for under law and equity Federal Laws, jointly
and severally;

2) Awarding pre and post judgment interest;

4) Awarding the Kastels interest and costs and attorney's fees and
such further relief as the Court deems just and proper.

D. Judgment against Robert P. Bremner and the Nuveen North Carolina
Funds as follows:

1) Awarding the Kastels damages not limited to redemption of the
Kastels ARPS;

2) Awarding the Kastels interest and costs and attorney's fees and
such other relief as the Court deems just and fair.

E. Judgment against all Defendants for Fraud and Against Mesirow and
Nuveen for Negligent Misrepresentation as follows:

1) Rescinding the transactions and redeeming the ARPS shares held
in the Kastels' accounts;

2) Disgorging all profits and income received by said Defendants in
respect to all Nuveen ARPS purchased for the Kastel accounts
since January 2003.

3) Awarding compensatory, punitive and exemplary damages as well
as pre and post judgment interest;

4) Awarding the Kastels costs and attorney's fees and such other
relief as the Court deems just and proper.

F. Judgment against Mesirow, Nuveen and Deutsche Bank for violation of
the Illinois Securities Act as follows:

68

1) Declaring the sale of the North Carolina ARPS void and ordering the full amount paid for said ARPS, together with pre and post judgment interest at the rate of 10% less any amounts received by the Kastels;

2) Awarding the Kastels attorney fees and costs and such other relief as provided for in Section 5/13 of the ACT.

G. Judgment against Mesirow, Nuveen and Deutsche for violation of the North Carolina Securities ACT specifically Section 78A-56 as follows:

1) Repay amounts that the Kastels paid for the Nuveen North Carolina ARPS together with interest at the legal rate, costs and attorney's fees less the amount of income received by the Kastels on the ARPS;

2) Declare that said rights and remedies are in addition to any other rights that the Kastels at law or in equity as herein and above prayed for in this complaint and punitive damages as provided for;

3) Such other relief as the Court deems just and proper.


H. Judgment against All Defendants for the crime of theft by deception and obtaining property under false pretenses as follows.

1) By reason of the fraud perpetrated as above described and in the case of the Funds the receipt of the Kastels' monies from the Kastel Accounts at Mesirow, the Defendants repay amounts that the Kastels Nuveen North Carolina ARPS with interest;

2) Disgorge all profits earned by the Defendants for the ARPS sold by fraud and deception to the Kastel and North Carolina investors;.

3) Award compensatory and Punitive and Exemplary damages to the Kastels;

4) Award pre and post judgment interest and reasonable attorney's fees and costs to the Kastels;

5) Award the Kastels such further relief as the Court deems just and proper.

I. Judgment against Mesirow, Nuveen and Nuveen North Carolina Funds

1) Award the Kastels damages not less than three times the amount taken and withheld from the Kastels as shall be determined by the by the jury at trial for the emotional distress suffered by the Kastels by reason of these Defendants intentional and extreme and outrageous conduct in refusing to redeem the Kastels' ARPS;

JURY TRIAL DEMANDED

The Plaintiffs, Howard L. Kastel Trustee under the Howard L. Kastel Trust dated November 13, 1985 and Joan H. Kastel hereby respectfully demand a trial by jury.

Dated: April 23, 2010

Respectfully submitted

/s/ Howard L. Kastel

Howard L. Kastel

919-933-3181

70

10393 Holt

Chapel Hill, North Carolina 27517

N.C. State Bar #34615

Admitted to Practice before the U.S. District

Court for the Middle District of North Carolina