THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GREENSBORO DIVISION

CASE NO. 1:09-CV-646

_____

| | | |
|---|---|---|
| HOWARD L. KASTEL TRUSTEE | ) | |
| OF THE HOWARD L. KASTEL | ) | SECOND |
| TRUST DATED NOVEMBER 13, 1985 | ) | AMENDED COMPLAINT |
| And JOAN H. KASTEL | ) | |
| Plaintiffs | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| NUVEEN INVESTMENTS INC, NUVEEN | ) | |
| INVESTMENTS LLC and  ROBERT P. | ) | |
| BREMNER and MESIROW FINANCIAL | ) | |
| INC. and LAWRENCE M. COHEN | | |
| Defendants | ) | |

SECOND AMENDED COMPLAINT FOR  RESCISSION AND
OTHER EQUITABLE RELIEF AND DAMAGES AND OTHER RELIEF

Plaintiffs Howard L. Kastel, Trustee of the Howard L. Kastel Trust Dated
November 13, 1985 and Joan H. Kastel ("Plaintiffs" and/or "Kastels")  bring this

1

action and file this Second Amended Complaint ("SAC"), by and through their undersigned counsel, based upon personal knowledge as to their own acts and upon their investigation exceeding 1600 hours, which included among other things, a review of: (a) public statements and marketing materials and other documents written or published by Nuveen Investments and their affiliates, agents and employees and Mesirow Financial; (b) United States Securities and Exchange Commission filings (SEC"); (c) public filings and statements made in court proceedings and civil government and regulatory investigations involving Auction Rate Securities ("ARS"), including but not limited to other proceedings involving other parties; (d) Complaints, Orders, Filings by the State of North Carolina Department of the Secretary of State and other similar documents filed in proceedings in other states; (e) statements and press releases by the SEC Staff; (f) statements and testimony at Congressional Hearings; (g) reports and studies published by the Securities Industry Financial Marketing Association (SIFMA) including "Best Practices for Broker-Dealers of Auction Rate Securities" dated 2007; (h) Reports prepared by the Auction Rate Securities Task Force on behalf of the North American Securities Administrators Association (NASAA); (h) study by NERA Economic Consulting and Works Cited and Bibliography referencing Auction Practices; (i) Chicago Federal Reserve Bank Letter "Explaining the decline in Auction Rate Securities" and numerous other authoritative reports; (j) an Advisory published by PriceWaterhouseCoopers re: Investors' Classification of Auction Rate Securities dated March 4, 2005; (k) documents prepared by certain broker dealers and Auction Agents identified herein; (l) detailed description prepared by Merrill Lynch in response to the SEC's 2006 order detailing various risk factors; (m) documents believed to be authentic, copies of internal emails and

other business records, and securities reports, press releases and media reports and (n) discussions with representatives of the Defendants, investors and other persons.

## PRELIMINARY STATEMENT

1.  Plaintiffs, investors in Auction Rate Preferred Shares ("ARPS") issued by three Nuveen North Carolina Closed End Funds, commonly referred to as Auction Rate Securities ("ARS") bring this action against their Financial Adviser, the Issuer and Adviser to Funds and the Chairman of the Board of the Funds who collectively sold or controlled the sale of the securities on which these claims are based.  This action alleges that specific and repeated statements made by Plaintiff's Financial Adviser,  were materially false and misleading, notwithstanding the fact that the evidence shows that the
defendants knew the facts and had access to information that demonstrated that the statements were untrue or that they were grossly reckless in making the statements with disregard for the truth.  This Complaint further alleges that the Defendants had a duty to disclose because the omitted facts were important to a reasonable investor and were important to the Kastels.

2.  Plaintiffs bring this Second Amended Complaint for Declaratory Judgment Breach of Fiduciary Duty, Constructive Fraud for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty and Constructive Fraud, Negligence, Negligent Misrepresentation, Fraud, Violations of Section 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5, Recession and Related Relief Under the North Carolina Securities Act and/or the Illinois Securities Act and the Tort of Intentional Infliction of Emotional Distress.  This action also seeks

3

recovery of statutory interest, consequential damages and exemplary damages (other than in respect to the claims under the Securities Exchange Act of 1934) and recessional damages because of Defendants intentional, outrageous and inexcusable course of conduct.

3.  Plaintiffs also seek a Declaratory Judgment that the Client Agreements and, specifically the arbitration provisions contained therein, that the Kastels executed while residents of Illinois, are not enforceable against them now that they are North Carolina Residents by reason of Mesirow's letter dated August 27, 2009 agreeing not to assert a right to arbitration.   This action involves claims under the securities acts of North Carolina and Illinois, which, in pertinent part, provide for joint and several liability and equitable relief.   It would be impossible to adjudicate the rights of the parties in a consistent manner in an Arbitration proceeding involving only one party.

4.  THIS LAWSUIT IS NOT A CLASS ACTION.  Although the Fraud complained of herein injured many innocent investors, the specific facts and detailed claims in this Complaint relate to the Kastels.  This Complaint contains detailed pleading of acts and facts that provide the grounds upon which the Fraud claims rest and demonstrate that the numerous factual allegations raise the Kastels' right to relief above a speculative level.  The Plaintiffs conducted a burdensome investigation that addressed the requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995.  Certain claims that do not sound in fraud and are not covered by the heightened pleading requirements. The detail provided is intended to demonstrate a clear understanding of the Plaintiffs' pleading obligation.

4

5.  All of the claims arise out of the Purchase and Sale to the Kastels and the placement of Hold Orders for the account of the Kastels by Defendants in respect to 88 shares of Nuveen North Carolina Auction Preferred ("ARPS") Securities during a period commencing August 23, 2007 and ending on or about February 15, 2008.  As of February 2008, the purchase price of the Kastel's ARPS totaled $2.2 million.

## THE PARTIES

6.  Howard L. Kastel is the Trustee of the Howard L. Kastel Trust Dated November 13, 1985.  Howard L. Kastel is a resident of North Carolina.  Joan H. Kastel is the wife of Howard L. Kastel and is also a resident of North Carolina. The Trust has had an account at Mesirow since November 2002. There is no written "client account agreement" between Mesirow and the Trust.  Prior to November 2002 Howard L. Kastel had a Cash Account Agreement dated August 15, 1989.  Joan H. Kastel executed a Client Agreement prior to November 2005 The Kastels became citizens and residents of North Carolina in 2006 and do not conduct business in Illinois.  The addresses on the Kastels' account were changed to North Carolina in 2006.  Howard L. Kastel is 78 years old and a substantially retired lawyer except for part time employment as a Consultant, Arbitrator and Mediator.  None of said employment activities are outside of North Carolina.  Joan H. Kastel is a 76 years old retired Public School Speech and Language Pathologist.

7.  Nuveen Investments Inc ("Nuveen") is incorporated in Delaware with its principal place of business in Chicago Illinois.  Nuveen is the Sponsor and

5

Investment Adviser to all of the self-styled Nuveen Closed End ARPS Funds that the Kastels invested in including the Nuveen North Carolina Funds. Nuveen Investments LLC. is an affiliate of Nuveen, was controlled by Nuveen and also has it principal place of business in Chicago, Illinois. The Nuveen and its affiliated entities are collectively referred to as "Nuveen". Nuveen is and was the largest issuer of ARPS in the U.S. The Nuveen Funds issued more than $11 Billion of Tax Exempt Municipal ARPS. The Nuveen North Carolina Funds issued a total of $120 million ARPS in the Nuveen North Carolina Funds. For many years Nuveen acted as Sponsor, Issuer, Underwriter, Manager and Broker Dealer in connection with as many as 100 funds. At all times material hereto, Nuveen was engaged in the marketing and sale of ARPS. On information and belief, Nuveen is currently the subject of an investigation by the SEC "In the Matter of Certain Auction Practices". Nuveen is registered as a Broker Dealer in North Carolina and does business in North Carolina in connection with the Nuveen North Carolina Funds.

8. Robert P. Bremner is a resident of Washington D.C. Robert Bremner is the Chairman of the Board of the Nuveen North Carolina Funds and a member of the Board of Trustees since 1997. As Chairman of the Board of Trustees he has oversight responsibility over the management of the Fund's Investment Advisor and is a controlling person in respect to North Carolina Funds as that term is defined in the Exchange Act. The unlawful acts and practices participated in by Nuveen and Nuveen Funds took place during the period when he was a member of the Board. The knowledge and acts of the Nuveen North Carolina Funds alleged herein are attributed to Bemner.

9.  Mesirow Financial Inc ("Mesirow" or "Mesirow Financial") is incorporated in Delaware with its principal Executive Offices in Chicago Illinois.   Mesirow is registered with the SEC as a broker dealer and is registered as a broker dealer in North Carolina.  Mesirow Financial has an office in Charlotte North Carolina. Mesirow conducts business as an investment adviser, broker dealer and consultant in North Carolina.  For many years, Mesirow and Nuveen have had a close business relationship.  The Kastels have had a relationship with Mesirow for more than 40 years

10.  Lawrence M. Cohen ("Cohen") is a Senior Managing Director at Mesirow and was the Kastel's Investment Advisor.  Cohen is a resident and citizen of the state of Illinois.  Because of Howard Kastel's long-term relationship with Cohen, the Kastels reposed great trust and confidence in Cohen, which as matter of fact, created a fiduciary duty between Mesirow and the Kastels.  Cohen was the Kastels' Investment Adviser for more than 20 years and the Kastels enjoyed a relationship of trust and confidence with Cohen and Mesirow.  The Howard L. Kastel Trust has had an account with Mesirow for more than 6 years invested primarily in short-term municipal securities and money markets.  Howard Kastel opened an individual account with Mesirow Investment Services, Inc (merged or consolidated with Mesirow Financial) in 1988.  Howard Kastel had an account with Mesirow Financial until November 2002.  To the best of her recollection, Joan H. Kastel opened an account at Mesirow in or about 5 or 6 years ago when she transferred an account (from another broker), which she had inherited from her father.   Cohen was a CPA and a former partner of one of the largest National Accounting Firms. Howard Kastel has known Larry Cohen since the early 1970s. At all times material hereto Cohen acted on behalf of and for the benefit of Mesirow Financial.

## JURISDICTION AND VENUE

11.  This Court has jurisdiction over the subject matter of this action pursuant to Sections 27 of the Securities Exchange Act of 1934 ("Exchange Act")(15 U.S.C. §Sec. 78  and 28 U.S.C  §1331, 1332 and 1337).  The claims asserted herein arise under Section 10(b) and 20 (a) of the Exchange Act and Rule 10b-5 promulgated there under by the SEC.  Additionally, claims are asserted under North Carolina statutory and common law including G.S. Sections 78 A-8, 8A-12 (5), Section 78A-56 and Section 78A-57; the Securities Laws of the State of Illinois, specifically Section 13 of the Illinois Securities ACT which provide in pertinent part that a sale made in violation of the provisions of the Act is void.

12.  Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. Sections 1391.  In addition, certain of the violations complained of took place in this district.  In connection with acts alleged in this Complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails and interstate telephone.

## GENERAL ALLEGATIONS

13.  ARPS issued by the Nuveen North Carolina Closed End Funds and marketed by Nuveen through Mesirow and certain brokers dealers were perpetual preferred stock with no maturity date and no right of redemption that paid interest at rates purportedly set at periodic auctions.  ARPS were sold at par value so that the return on the investment to the investor was determined through the managed auction

8

process controlled by agents of Nuveen. The true value of the ARPS, like any debt instrument, was determined by the rate of return and the length of the term, the risks and other relevant and material factors. The so-called Dutch auction process made the ARPS derivatives—that is the ARPS purportedly derived their interest rates based on the interest rate at a weekly auction. These derivatives were not low risk securities. Prior to February 15, 2008 the Kastel and most ARPS investors did not have a clue about the liquidity risk. Nuveen never intended that the risk of illiquidity be transparent to investors. ARPS, however, were marketed, remarketed and sold as highly liquid short-term investments with the risk characteristics of money market funds and as an attractive alternative to money market investors.

14. The ARPS were sold as puttable shares. A puttable share is a share with rights to put [tender]the shares back to issuer at a specified price. In the case of the ARPS, the specified price is Par--$25,000. It is a right that allows the holder to choose to "put" the share. However, in the case of the ARPS, the put could only be exercised in so-called modified Dutch auctions conducted every 7 days. The ARPS were not publicly traded. After the initial purchase, the ARPS purportedly rolled over every week. Under the procedures devised by Nuveen, a "Hold at Rate" order was submitted to the auction agent by Nuveen. Alternatively, a Sell order could be placed. Under the system, broker dealers submitted customer bids and if the bids were insufficient the auction would fail. Nuveen was an authorized broker dealer and acted with Mesirow to submit orders to the auction agent. Nuveen controlled the auction agent. The ARPS were complex securities. They were derivatives whose interest calculations were derived from the opaque and

9

fixed auction mechanism that ultimately defaulted to an interest rate derived from another blended interest rate that itself was a derivative.

15. In June 2004 the SEC announced that it was investigating whether the so-called ARS auctions were improperly handled. In 2006 the SEC announced that it had fined 15 large Broker Dealers "Broker Dealers" $13 million and stated investors might not have been aware of the liquidity risks. Both of these announcements were published in the Wall Street Journal. These announcements did not disclose that Nuveen controlled and participated in the flawed auctions and that its ARPS had the same risk associated with them. The Broker Dealers, including Citigroup Global Markets Inc "Citigroup" and Merrill Lynch, at the request of Nuveen, generally and regularly submitted support bids in Nuveen's ARPS auctions to ensure that that the auctions did not fail. In May 2006, Nuveen and Mesirow knew that the SEC Order issued in respect to the Broker Dealers outlined a standard for disclosure. In September 2006, in responses to a 2006 SEC Order, the broker dealers detailed the risks of the auction market and its role. Citigroup disclosed that it routinely placed bids to "prevent auction failure" but that investors should not assume that it will continue to place support bids or that "failed auctions and unfavorable auction rates will not occur". Merrill Lynch disclosed its procedure to its customers as early as October 2006. These disclosure statements described how the Broker Dealers "intervened in auctions by bidding for their proprietary accounts" to prevent auction failures. In response to the Order, Merrill Lynch also described its practices and procedures including that it routinely placed orders "to prevent auction failures" but that investors should not assume that it would continue to place support bids or that "auction failures will not occur". The Nuveen ARPS were not specifically referenced in the Order or the

10

disclosure statements. Both Nuveen and Mesirow had knowledge of the content of the disclosure documents, but did not publish or distribute disclosure statements to their customers. By the end of 2006, both Nuveen and Mesirow knew or should have known that they could not continue to rely on the obscure, incomplete and misleading disclosures in the Nuveen North Carolina Prospectuses and the Nuveen promotional material. Nuveen and Mesirow knew that there was a substantial likelihood that reasonable investors would have considered corrected disclosures material.

16. The Kastels were forced to bring this lawsuit despite the fact that the SEC and other state regulators have ordered the Broker Dealers, who were participants in Nuveen's so called auction process, to repurchase billions of the ARPS and pay hundreds of millions in fines as a result of their unlawful conduct. The Kastels and thousands of other ARS investors were left out of these settlements purportedly because they did not purchase their ARPS from the named broker dealers.

17. Nuveen and the Nuveen North Carolina Funds as underwriters, managers, remarketing underwriters and broker dealers participated in and controlled so-called the auction markets conducted in respect to the Nuveen North Carolina Funds. Mesirow and Nuveen knew that many broker dealers had announced agreements to comply with Court Orders to redeem and reimburse certain eligible clients that were victims of the Auction Rate Scheme. The Kastels further state that representatives of Nuveen have engaged in conversations and made representations to the SEC regarding the redemption of the ARPS.

18. Mesirow and Nuveen were members of FINRA and the Securities Industry and Financial Markets Association ("SIFMA"). They had knowledge of the Best Practices for Broker-Dealers of Auction Rate Securities published SIFMA in Spring 2007 that provided in Section 4.2.4 that "Broker-Dealer should educate issuers and investors as to the material features of Auction Rate Securities". Mesirow and Nuveen failed to comply with these provisions in their dealings with Kastels.

THE FIDUCIARY RELATION BETWEEN MESIROW,
NUVEEN AND THE KASTELS

19. Mesirow and Cohen owed the Kastel the highest standard of care. Nuveen, by reason of its entangled relationship with Mesirow and its direct participation in the selection and purchase of the North Carolina ARPS and the placement of more than 30 hold orders for the Kastels during the period August 2007 to February 2008, also owed the Kastels the highest standard of care. Nuveen secretly participated in the transactions and became a fiduciary in fact by operation of law. Mesirow and Cohen and Nuveen knew that Kastel relationship was "all about trust", that as advisers they had a duty to investigate and disclose the risks and other material facts. Although the Kastels were not aware of Nuveen's critical role, Nuveen's active participation made them its constructive fiduciary. Mesirow was the "feeder" as that term is used in reference to the operation of the Ponzi scheme described below. Nuveen is estopped to deny that the misleading and incomplete disclosures that Mesirow made to the Kastels were part of a joint enterprise because what was disclosed or not disclosed was consistent with Nuveen marketing program. Under the procedures established by Nuveen, it voluntarily

12

elected not to keep a record of the identity of Mesirow's customers. But for Nuveen's active participation, the Kastels would not have purchased the North Carolina ARPS.

20.  As disclosed to Congress in September 2008 by Nuveen's Executive Vice-president Bill Adams, Nuveen acted as co-broker with Mesirow on transactions engaged in by Mesirow and shared the fees with Mesirow for said transactions. As a result of its undisclosed co-broker status, Nuveen owed the same duties to Mesirow customers including the Kastels. In the case of Mesirow that duty included a fiduciary duty to those clients who placed their special trust in Mesirow.

21.  Under North Carolina Law a confidential, fiduciary relationship existed between the Kastels and Mesirow. Mesirow was obligated to exercise the utmost good faith which included a continuing duty to inform regarding risks and to correct or amend misleading disclosures. Mesirow and Nuveen also had a special duty to its customers to undertake an adequate investigation of the securities it recommended and sold to its customers. Mesirow and Nuveen breached that duty. Under the Law, breach of fiduciary duty constitutes the basis for a constructive fraud. Both Mesirow and Nuveen were jointly obligated to inform the Kastels regarding material information and update that information as long as they continued to act in a fiduciary capacity. Under the law, each of them also aided and abetted the others' breach of trust. Breach of Fiduciary duty and constructive fraud are torts and are not covered by the Pleading requirements of PLSRA.

22.  Plaintiffs state that notice of their election to rescind the sales of Nuveen North Carolina ARPS was served by Certified Mail on February 22, 2008, return receipt

requested, and received by Mesirow Financial on February 27, 2008, Nuveen Investments on February 28, 2008 and Deutsche Bank on February 27, 2008.   By reason of the Defendants breach of fiduciary duty, constructive fraud for breach of fiduciary duty, aiding and abetting breach of fiduciary duty and constructive fraud, which acts were willful and reckless with wanton disregard for the rights of the Kastels, Plaintiffs seek to recover punitive and exemplary damages.


## BACKGROUND TO PURCHASE OF $2.2 MILLION OF
## NUVEEN NORTH CAROLINA ARPS

23.  Mesirow first purchased Nuveen Auction Rate Preferred shares ("ARPS") (Nuveen Mun Advantage Pfd F 7 Shares $25,000 for a total of $175,000 and Nuveen Mun Opportunity Pfd  M 7 Shares $25,000 for a total of $175,000) for the account of Howard Kastel in January 1998.  At the time  Cohen described the safety of the Nuveen shares.  He explained that Nuveen Shares were "7 day munis" or "weeklies" and rolled every seven days.  He stated that the Nuveen shares were "safe short term preferred"—the preference related to the rights in respect to the interest paid and the rights on liquidation.  He also said that the rate of interest was determined at weekly auctions—hence the shares were auction rate preferred shares.   Cohen never disclosed that the auctions were orchestrated by Nuveen and were not a real public auction (like short-term treasuries) but a managed process. Cohen said they were similar to money market shares except that they rolled over weekly.  Cohen never disclosed that the shares had no maturity date, no right of redemption, were not puttable and needed to be sold at an auction, and had a risk

of illiquidity. At the time Cohen did not identify the specific funds in which he intended to invest the Kastel's money. Mesirow's and Nuveen's trading desks selected the specific funds and determined the procedure for placing hold orders. No prospectus or disclosure document was furnished to Kastel. Had Kastel known of the undisclosed risks and the true facts related to Nuveen shares he would not have permitted Cohen to purchase any Nuveen shares for his account. Mesirow did not identify the specific funds or the shares until after they were purchased for Kastel's account. These shares were sold in January 2001.

24. On January 9, 2002, Mesirow purchased 4 shares of Nuveen Real Estate Taxable SR W for the account of Howard L. Kastel Trust dated November 13, 1985 ("the Trust"). Kastel has no present recollection as to the facts related to this investment or how the transaction was initiated except that he states that he had no knowledge about this Nuveen Fund and received no disclosure documents in respect thereto. These shares were sold on July 31, 2002. In a telephone conversation on or about June 25, 2003, Cohen proposed that Kastel buy additional shares of Short Term Nuveen Munis for the Trust account. Kastel did not learn the identity of the Fund until he received a confirmation a few days later. On June 26, 2003 Mesirow purchased 15 shares of Nuveen Premium Income 4 series Th for a total of $375,000 for the Trust's account. On August 19, 2003 Mesirow purchased 23 shares of Nuveen PFD & CV F2 TXB for a total of $575,000 for the Trust's account. In a conversation a day or two earlier, Cohen repeated his description of the proposed investment as "short term munis". Kastel never received any disclosure documents. As of December 31, the 7 shares of Nuveen Mun Opportunity Pfd M were in the Trust account and the Trust had an investment in the three Nuveen Funds totaling $1,125,000. On or about March

15

2004 Mesirow purchased 12 shares of Nuveen Premium Inc Mun Fd 4 SER W for the Trust Account and 12 shares of Nuveen Insd Prem Inc Mun Ser T for the Trust Account for a total of $600,000. On June 4, 2004 Mesirow sold 3 shares of Nuveen Pfd & Conv Income Pref for a total of $75,000. On November 19, 2004 Mesirow sold an additional 8 shares of Nuveen Pfd & Conv Inc Pref for $200,000. As of December 31, 2004 the Trust account had a total of 58 shares of Nuveen ARPS for a total of $1,450,000. On March 15, 2005 Mesirow purchased 6 shares of Nuveen Mun Mkt Oppty Fd Series T for $150,000. As of December 31, 2005 the trust Account had a total of 64 shares of Nuveen ARPS for a total of $1,600,000. On August 3, 2006 Mesirow purchased 10 shares of Nuveen Insd Prem inc Fd Ser Th for $250,000. In 2006 Mesirow purchased 5 shares of Nuveen Perm Plus Muni Ser Th for the account of Joan Kastel for $125,000. As of December 31, 2006 the Trust account had a total of 74 shares of Nuveen ARPS for a total of $1,850,000 and the Joan Kastel account had a total of 5 ARPS for $125.000. Kastel did not maintain a diary in respect to these purchases and sales. Cohen did not always tell Kastel about these transactions and Kastel would learn of them after he received a confirmation from Mesirow. The confirmations did not disclose any material facts or disclose any risks. Each conversation with Cohen was consistent—there was no risk. Each time Cohen repeated that the shares were short term munis or weeklies backed by assets that were three times the amount of munis outstanding. Cohen never identified the specific fund. Cohen never disclosed the process where Mesirow and Nuveen jointly selected and traded the ARPS and placed Hold orders in respect thereto. By August 2007. the Kastels had been lulled into believing that there was an active market for Nuveen's ARPS and that the funds their money was invested in had been selected by Cohen and that they were short term and liquid investments and puttable weekly.

16

25.  On August 17, 2007, Cohen contacted Howard Kastel by telephone at his home in Chapel Hill, North Carolina and suggested in substance:  "In view of your move to North Carolina, I am going to put you into Nuveen's North Carolina Funds to take advantage of the double tax exemption".   During this telephone conversation Cohen did not identify the Nuveen North Carolina tax exempt funds that he was going to buy other than the fact that the interest earned by the funds also would not be subject to North Carolina's income tax and that now we were North Carolina residents we should be in North Carolina Funds. Commencing shortly after this conversation, the following transaction were effected in the Kastels accounts:

Howard L. Kastel Trust

8/20 Sold 7 shares  of Nuveen Mun Mkt Opportunity FD Series M $175,000

8/21 Sold 12 shares of Nuveen Insd Premium Income Mun FD  Series T $300,000

8/21 Sold 6 shares of  Nuveen Mun Mkt Opportunity FD  Series T $150,000

8/23 Buy  8 shares of Nuveen NC Prem Income Mun FD Series Th $200,000

8/29 Buy  20 shares of Nuveen NC Divid Adv FD 3 Mun Series W $500,000

8/30 Buy  6 shares of Nuveen NC Prem Income Mun Fd Series Th $150,000

9/05 Sell 12 shares of Nuveen Prem Inc Fd 4 Mun  Series W $300,000

9/05 Buy 12 shares of Nuveen NC Divid Fd 3 Mun Series W $300,000

9/06 Sell 12 shares of Nuveen Prem Inc Fund 4 Mun Series Th $375,000

9/06 Sell 10 shares of Nuveen Insd Prem fd 2 Mun Series Th $250,000

9/06 Buy 25 shares of Nuveen NC Prem Income Mun Fd Series Th $650,000

9/07 Sell 12 shares of Nuveen Multi Strategy Income Fd Series F $300,000

9/07 Buy  12 shares of Nuveen NC Divid Adv FD 2 Mun Series F $300,000

Joan H. Kastel

8/23 Sell 5 shares of Nuveen Perf Municpal FD Series Th $125,000

8/23 Buy 5 shares of Nuveen NC Prem Income FD Series Th $125,000

## NON-DISCLOSURE AND MISLEADING
## STATEMENTS OF MATERIAL FACTS

26. During the August 17, 2007 telephone conversation when Cohen described his plan to sell the "national" Nuveen Funds and purchase the Nuveen North Carolina Funds, Cohen never said anything about the auction procedures. Cohen did not state that:

a) Mesirow could not buy the shares and had to buy them through Nuveen's trading desk because only certain brokers were party to a "Broker Dealer Agreement" with the Auction Agent;

b) there was no market for the shares other than through the auction controlled by Nuveen;

c) the Auction Agent was under a contract with Nuveen and managed and controlled the auctions;

d) the original prospectus contained an incomplete description of how the auction worked;

e) the NC ARPS were long-term debt instruments with no maturity date and not short-term "weeklies" and "money market like liquid securities";

f) the "Dutch Auction" was not an auction at all but an arranged, manipulated unlawful remarketing process ;

g) the so-called auction could fail if more shares are offered than there were buyers which is sometimes referred to as "supply demand imbalance shares";

h) certain broker dealers were under contracts to act as "remarketing

18

brokers" and were "propping up" the auctions to give the false appearance of active trading because the "maximum rate was too low to create a real market";

i)  cover bids by the remarketing agents could be insufficient or absent;

j)  an affiliate of Nuveen was one of the remarketing agents;

k)  the remarketing agents engaged in price talk before each auction and shared pricing information regarding the number shares and other information that constituted insider information that was unlawful and the subject of an SEC Cease and Desist Order;

l)  auctions could fail and investors would be locked into a long-term illiquid investment at unconscionably low rates with no option to sell,    redeem or put their shares;

m) the Kastels might not be able to sell their ARPS because the default "Maximum Rate" was substantially below market and as a result the value of the ARPS was less than 50% of price paid;

n) the Funds were not market based funds, that is to say, had no basis  in market reality and the rates established were not market driven;

o) as of August 21, 2007 other auctions had failed;

p) Mesirow intended to and did put in Hold orders every week without communicating with the Kastels;

q) the SEC as early as 2004 announced a formal investigation of Auction Rate Securities (including ARPS) and in 2006 filed Complaints against the broker dealers including Merrill Lynch and CitiGroup and published orders censuring Merrill Lynch and CitiGroup, ordering each of them to cease and desist from further violations of the Securities Act and ordering each of them to pay a civil penalty;

r)  in connection with the SEC investigation and proceedings, each of the parties had disclosed that they had engaged in the   unlawful practices by manipulating the auction market;

s) the ARPS were not "puttable" and only the Nuveen Funds had an option to redeem shares and the ARPS preference existed only in event the Funds were liquidated;

t) Nuveen and the Fund Trustees had conflicts of interest;

u) in 2006, the SEC's municipal securities chief Martha Haines, in a public address, reported in the Bond Buyer, an important industry publication, that the way rates were set on auction rate securities bore little resemblance to the way the process was described in offering statements or the kind of Dutch Auctions known to most investors;

v)  That as a result of insufficient investor participation at the auction, as orchestrated by Nuveen and the underwriter Broker Dealers, Nuveen was able to assert almost complete control over the rates of interest paid on Nuveen's ARPS;

w)  the remarketing scheme that was sponsored by Nuveen required the issuance and delivery of a Prospectus, which Nuveen knew would cause the market for ARPS to dry up;

x) in the event the auctions failed the Broker Dealers and Nuveen would continue to pay themselves hundreds of millions of dollars in fees;

y)  money market funds were ineligible to hold ARPS due to SEC rules which restrict money market funds to short term securities with a final maturity date of 397 days or less and notwithstanding the fact Nuveen marketed it ARPS as "weeklies" money market funds would not purchase them in the event of a failed auction;

20

z) Nuveen and Mesirow treated the ARPS as fungible and therefore the liquidity risks were substantially the same as being invested in one fund

aa) Nuveen had no plan to redeem illiquid ARPS by causing the Funds to sell assets, that the Nuveen Funds had no liquidity backstop which would allow investors to redeem shares at par and that the ARPS preference was not operative if the Funds froze;

bb) That the Trustees of the Funds were in reality controlled by Nuveen, protected the interests of the Common Shareholders and the so-called Trustees elected by the ARPS shareholders did not sit on the Board in a representative capacity.

The foregoing statements and omissions were material. The Kastels justifiably relied on the Defendants' misrepresentations and omissions. If the Kastels had known the true facts they would not have permitted the Nuveen Funds to be purchased for their accounts.

27. Mesirow had actual knowledge and Nuveen had constructive knowledge that the Kastels and other investors in the Nuveen ARPS believed that were investing in short term liquid shares. The Defendants intentionally and willfully deceived the Kastels and other investors. In fact, in an 2008 interview, Diane Swonk, Mesirow's Chief Economist admitted that Mesirow recommending that investors purchase Auction Rate Securities "was bad advice".

28. Mesirow and Nuveen did not disclose any of the risk factors and unlawful practices to the Kastels at the time of these transactions. Mesirow and Nuveen also did not disclose that their officers and employees and the Trustees of the Nuveen Funds had various conflicts including, but not limited to, the ownership of

21

Common Shares of the Nuveen Funds. These conflicts of interest existed because the Common Shares benefited from the leverage created by the artificially low rates paid to the ARPS investors. On February 15, 2008 Cohen first disclosed this conflict of interest to Howard Kastel. Mesirow and Nuveen also knew that the effect of setting the dividend rates below fair market rates, and the prospect of low "maximum rates" that would result from a failed auction, had alienated institutional and other sophisticated investors. This lack of market interest resulted in an accelerated propping up of the auctions by the Broker Dealers. The reality was the auction process had already failed because Nuveen, assisted by the broker dealers created, a sham market for the purpose of intentionally deceiving investors. The artificially low rates also deprived the Kastels and other investors from receiving the return on their investments that they would have received absent the interference and manipulation orchestrated by Nuveen. Mesirow and Nuveen had knowledge and information that certain ARS auctions had failed prior to August 23, 2007 and that the risk of auction failure had increased and continued to increase in late 2007 and January 2008. By January 2008, Nuveen had specific knowledge of auction failures involving the Nuveen Funds and the pending failure of more Nuveen Fund auctions that would result from Lehman Brothers' decision to discontinue propping up the Nuveen ARPS auctions as of, on or about, February 13, 2008. By January 2008 the date for the collapse of the ARPS market had been set. Lehman Brothers withdrawal of support triggered the simultaneous withdrawal by other broker dealers. On January 28, 2008, 16 days before the Auction Market collapsed, Nuveen met with Merrill Lynch and other broker dealers to discuss a proposal that they serve as replacements for the $2.4 billion that was managed by Lehman. Nuveen and Merrill knew that the Lehman withdrawal was timed for, on or about, February 14, 2008. In fact, Lehman

Brothers withdrew and the market collapsed or about February 11, 2008 when Nuveen's broker dealers, by parallel conduct, stopped supporting the auctions thereby freezing the ARPS held by the Kastels and thousands of other individual investors.

29. The Defendants knew as early as 2006 that the Auctions were managed to give the appearance of active trading and that without the support of the broker dealers the auctions would fail. The Defendants knew that the artificially low level of "maximum rates", payable in the event of a failed auction was statistically significant as a determinant of the likelihood of auction failure. Hence, the auctions did not fail solely because they withdrew their support; the auctions failed because investors did not have a right to "PUT" their shares to the funds and because the "Maximum Rate" was set so low no person with a reasonable understanding would ever buy at the auction. None of these material facts were disclosed. They were intentionally not disclosed making what was disclosed false.

30. By no later than August 2007, the Defendants knew that the market for ARPS was diminishing, that auctions were being propped up and that the apparent liquidity resulted from artificial support. They also knew that most of the investors in 2007 did not receive a prospectus (which was obtuse, complicated and a misleading document) and that no investor would conduct an independent investigation for the small additional interest they received. They also knew Investors faced serious risks that auctions would fail and the Kastels' money would be frozen. Nuveen's covert activities were designed to hide the facts. As a result of Defendants' cover up the Kastels remained unaware of the facts and the undisclosed risks until after February 15, 2008. Mesirow and Nuveen perpetrated

23

this hoax in order to continue to participate in the fees generated by the huge pool of money.

31. In respect to the Kastels, Mesirow made false representations by making statements that implied it had a reasonable basis to form a belief and believed that the Nuveen ARPS were safe, short-term liquid securities. As securities professionals, Mesirow and Cohen had a "special duty" to its customers to undertake an adequate investigation of the securities it recommended and sold to its customers. Mesirow's conduct breached its duty to the Kastels. Additionally, Mesirow and Nuveen had a continuing obligation to the Kastels to monitor market conditions and make the Kastels aware of any relevant and material decision-making criteria that would influence their decisions to continue to roll over the Nuveen weeklies. Had Mesirow and Nuveen shared this material information about the ARPS auction market and the continuing manipulation by the broker dealers, the Kastels would have redeemed or sold all of their Nuveen weeklies. During the period 2002 to the present time, Mesirow and Nuveen continued to share fees. All of the Defendants continue to be paid fees in connection the Nuveen ARPS.

32. Mesirow and Nuveen marketed Auction Rate Securities as safe, liquid short-term investments notwithstanding the fact that they knew that were not safe, liquid cash investments. In February 2008 the ARPS market froze leaving the Kastels and thousands of other investors unable to liquidate their investments and leaving them locked into the phony "maximum interest rates" that were a fraction of what long-term preferred shares of equal quality paid as interest. Moreover, the term "Maximum Rate" implies that the rate was above market rates. A true market rate would have, at least in theory, enhanced liquidity for the ARPS and provided an

24

incentive to purchasers to avoid the auction failures. The proximate cause of the auction-rate market collapse was the misrepresentations by the Defendants, their manipulation of the ARPS market and the select disclosure of the coming crash to some investors who were able to sell or redeem their ARPS prior to February 13, 2008. The proximate cause was also the fact that the ARPS did not carry sufficient maximum rates to ensure liquidity unless the broker dealers continued to secretly support the auction process. None of these material facts were disclosed to the Kastels. The so-called "Dutch" auction mechanism makes the ARPS a form of derivative—that is the ARPS purportedly derive their interest rate based on the interest rate at a weekly auction. Moreover, these derivatives were not safe securities and were made even more risky by the unlawful conduct of the Defendants. Money Market Funds are ineligible to hold ARPS due to SEC Rules. The rules restrict money market funds investments to securities with a final maturity date of 397 days or less; hence, these securities are by rule not short-term liquid securities. The Kastels are forced to bring this lawsuit despite the fact that the SEC and other state regulators have ordered the Participants to repurchase billions of the illiquid securities from their own customers and to pay hundreds of millions in fines as a result of their unlawful conduct. The Kastel and thousands of Investors have been left out of the settlements. Nuveen and Mesirow have played hardball since February 2008 and, unless the Nuveen investors purchased their ARPS from the one of the settling Defendants, they have been left to fend for themselves while Nuveen and Mesirow continue to pay themselves large fees while they wrongfully hold the money.

## NEGLIGENT MISREPRESENTATION

33.  As advisers,  Mesirow and Nuveen were in the business of gathering information regarding these transactions and communicating information that would have put the Kastels on Notice of the warnings and risks, including the risk that the ARPS market could stop functioning, thereby locking up innocent investors' money.  This information was known in the securities business since 2004 or earlier.

34.  Cohen knew that in his relationship with the Kastels, neither he nor Mesirow provided disclosure documents.  Mesirow had a pattern and practice of describing these investments as AAA and AA rated ultra short-term bond funds.  Liquidity issues were not disclosed.  Larry Cohen knew that the Kastels were risk adverse and considered the Nuveen ARPS as cash-like investments.  Mesirow and Nuveen has a continuing duty to disclose all of the risks, to refrain from self dealing and to refrain from misrepresenting any material fact in respect to the ARPS.  By not selling or redeeming the ARPS each week, Mesirow and Nuveen were "placing orders to Hold the ARPS".  In substance and fact,  Mesirow and Nuveen "purchased" the ARPS each week by not selling or redeeming the shares.  Hence, each week Nuveen, remarketed the ARPS without an effective  Registration statement as required under the securities laws.  Moreover, Mesirow knew that the Nuveen North Carolina Funds were not a suitable investment for the Kastels.  Although the Kastels' monies  were invested in three separate Nuveen Funds, these funds carried a common risk and an overly concentrated investment that increased an already great and undisclosed risk.  The ultimate breach of duty committed by Mesirow and Nuveen was the breach of trust and both are guilty.  The Kastels

26

justifiably relied on Mesirow's misrepresentations. Larry Cohen and Mesirow
knew the Kastels' goals and objectives were focused on liquidity and minimal risk.
Mesirow not only acted as the Kastels Investment Adviser, but Mesirow, for years,
acted as the Kastels' insurance agent and adviser and encouraged Kastel to focus
on the safety of the underlying municipal securities. Mesirow and Nuveen had a
fiduciary duty of utmost good faith and loyalty to the Kastels.

## LAST CLEAR CHANCE TO CORRECT MISREPRESENTATIONS
## AND THE FAILURE TO DISCLOSE

35. In about early November 2007 and continuing until January 2008, Howard
Kastel contacted Cohen by telephone with concerns related to the Nuveen
investments. These concerns were prompted by newspaper articles referencing
problems with some of the insurance companies that insured the quality of the
certain underlying investments held by the funds and the effect of these problems
on the credit worthiness of the Funds. On at least four dates in December and
January, Howard Kastel talked to Cohen and received repeated reassurance as to
the safety of the ARPS because of their so-called 300% preference on liquidation.
Unknown to the Kastels, one of Cohen's customers had become concerned in
respect to the liquidity risk. As a result of these concerns, Cohen contacted
Nuveen in about November 2007 with respect to these concerns. In November,
Paul Pezza, a Nuveen Vice President Adviser Consultant and Cohen conferred by
telephone regarding liquidity issues, At the time of these conversations, Mesirow
and Nuveen knew that their customers had not received a Nuveen Prospectus or
any updated disclosure statement disclosing that the auctions were being
supported by broker dealers and in danger of failing. He never advised the

Kastels of these concerns. Mesirow and Nuveen had a duty to speak and remained silent.

36. Mesirow had a pattern of misleading their customers in order to induce them to purchase Nuveen ARPS. In addition to placing HOLD orders for the Kastel's accounts, on at least four different occasions in January and February 2008, days before the auction market collapsed, Nuveen ARPS were also purchased for other customers notwithstanding that each of them specifically stated in writing that their money was to be invested in short term money market funds. Cohen and other Mesirow advisers knew that the Kastels and these other clients were risk adverse and on the basis of statements by Cohen and other Mesirow Investment Advisers believed that the Nuveen ARPS were cash-like investments. For the minuscule return on their investment, no person would have been stupid enough to have invested their money knowing what Cohen knew and did not disclose. Mesirow has specific information identifying these other clients.

37. One of the key elements of the Fraud was the intentional and fraudulent failure to deliver a copy of an accurate prospectus to investors at the time they purchased the ARPS. The Kastels did not receive a Nuveen Prospectus until February 15, 2008. In an email dated February 15, 2008, Cohen wrote: "Howard—attached is a prospectus for one of the Nuveen offerings. It is not specific to one of the funds you own, but probably similar." (The Prospectus attached was for "Nuveen Insured Tax-Free Advantage Municipal Fund". The Kastels never owned any shares in that Fund.) Prior to February 15, 2008, the Kastels and most ARPS investors did not have a clue about the liquidity risk or any other risk associated with the ARPS that were sold to them. Nuveen never intended that the risks of

illiquidity be transparent to the individual investors. In fact, the ARPS were exotic financial instruments traded in an controlled auction by agents under contract with Nuveen.

## THE UNLAWFUL EXCHANGE

38. For several years Nuveen sponsored and conducted an unregistered securities exchange in violation of that Securities Exchange Act. Several large broker-dealers, including Nuveen, were members of this unlawful exchange. This unlawful Exchange was established and operated pursuant to written agreements between Nuveen and Deutsche Bank. It was a private organization sponsored by Nuveen with membership limited to designated broker dealers only. As stated above, this exchange engaged in unlawful practices that included artificially supporting and manipulating the so-called auction market to maintain the appearance of liquidity and stability. The Defendants knew that the ARPS were not listed on an Exchange regulated by the SEC. Each of the Defendants knew that the ARPS would become illiquid as soon as the broker dealers stopped maintaining and supporting the market. The unlawful Exchange did not have the safeguards required of exchanges registered with the SEC. This unregistered exchange operated as an opaque process without any oversight. The exchange permitted its participants to favor themselves over non-member brokers. The exchange was designed to give a false appearance of active trading. In addition to operating an unregulated unlawful Securities Exchange, Nuveen and Deutsche Bank were, in effect, reissuing the shares that were being sold on the Exchange. They were "remarketing" the shares (in the nature of Treasury shares) without a registration statement and without delivering a prospectus or disclosure statement

29

right under the SEC's nose. In substance, the so-called auction, sponsored and managed by Nuveen, constituted a continuous offering of the ARPS through affiliates and underwriters. Under the securities laws, the participants were obligated to deliver an amended or supplemental prospectus to the Kastels and other innocent purchasers.

39. Moreover, the auction was not even an Auction. It was a managed process that permitted the participant broker dealers to secretly game the system and control the rates. The so-called auctions were "arranged" transactions where the broker dealers continued to acted as underwriters. The defendants knew that in a true "Dutch Auction" no bidder has knowledge of the bids submitted by other bidding thus protecting the auction process from manipulation and ensuring that the price set is truly reflective of the market. The defendants' unlawful practices were pervasive and intentional. Like all wrongdoers who prey on the innocent, they didn't expect to get caught.

40. Nuveen and Mesirow had actual knowledge that investors did not receive a prospectus or other disclosure information at the time of the purchases. Nuveen knew that Mesirow and other downstream broker dealers were marketing the ARPS as short-term cash equivalents—a place to safely park an investor's money.

## THE INTERMEDIATE PONZI SCHEME

41. Nuveen's business model was built on a series of assumptions—that it was a trusted member of the investment community and that its ARPS had a long history and a widespread reputation of providing attractive after-tax returns and of being

highly liquid.  In the case of the North Carolina ARPS, the Registration Statement contained an incomplete  description of the risks and was seriously flawed. Whether or not Nuveen and the Fund Trustees at one time believed that they were marketing an honest product, by 2004 they were on notice and knew that the ARPS were not short term liquid money market investments and that but for the uncertain, continued support of the broker dealers were effectively illiquid.   By July 2007 the broker dealers were keeping the Nuveen ARPS market afloat. Controlled by Nuveen, the scheme enabled the funds to issue $Billions of leveraged common shares that generated billions of dollars to Nuveen and $Millions to Mesirow.  Mesirow was a feeder and Nuveen needed feeders.  They were motivated for the huge pool of money and the unique opportunity to earn billions.

42.   By utilizing the fiction of a "Dutch Auction" Nuveen and the so-called Nuveen Closed End Funds sponsored a process that enabled it to transfer the ARPS to unsuspecting individual investors without any corrected or updated disclosures. By 2006 the marketing materials published and distributed by Nuveen were not updated or corrected. By 2006, Nuveen knew that the Big Four accounting firms had advised their clients that ARPS were not cash equivalents and that the original disclosure documents continued to be misleading.  This process was a sophisticated " Intermediate Ponzi Scheme" ("Ponzi Scheme") where new investors were enticed to purchase ARPS. This scheme permitted Nuveen and its broker-dealers to siphon off large fees.  Like any Ponzi Scheme, the perpetrators required new investors to bring in a constant flow new money to pay off the old investors and keep the cycle going. Nuveen assumed its reputation would lull investors into a state of complacency.  Nuveen knew that most investors had no

31

information regarding the risks. Nuveen and Robert Bremner and the Nuveen Funds' Board of Trustees knew that downstream broker dealers were marketing Auction Rate Securities as "the conservative's conservative" investment. Because Nuveen was the co-broker in connection with Mesirow transactions, Nuveen had the same obligations to Mesirow's customers.

43. Nuveen's scheme was propped up for years. By 2006 Nuveen knew that the auctions would fail but for the undisclosed support that was escalating the risks of a melt down. Nuveen's ARPS were superficially liquid for as long as Nuveen could rely on the underwriter broker dealers to prop up the auction markets. Nuveen also knew that the broker dealers took the position that they were not under any legal obligation to continue propping up the market and intended to do so only as long as they deemed that it was profitable. Like all "confidence game" participants, each of the Defendants had the appearance of law-abiding members of the investment banking community, but each of the Defendants had a role to play in respect to the commission of Nuveen ARPS fraud. By 2006 Nuveen and Mesirow knew that in the event the broker dealers discontinued their support, the so called "Maximum Rates" that would kick in were below market rates and that the Kastels and other investors would be "stuck" in perpetuity. By August 2007 because of the risk of illiquidity, the North Carolina ARPS were grossly overpriced and their fair market value was less than 50% of the amount that Mesirow and Nuveen caused the Kastels to pay. The participants created an intricate and exotic web, but clearly what they structured was an elaborate Ponzi Scheme with the Kastels two of the victims. Even the registration statements filed with the SEC were intended to hide the true risks—the complexity of it all was like a "fan dancer" covering up the true picture. The Scheme was like a conveyor belt that

32

dumped $billions of ARPS on unsuspecting investors. Using a toxic mix of obfuscation and confusion engineered by their lawyers, some of whom had worked for the SEC, Nuveen engaged in sophisticated trickery to avoid disclosure.

44. By reason of the February 2008 freeze, Nuveen no longer needed the continuous flow of new funds. It had locked in the investor's money and frozen the ARPS owned by thousands of individual investors. As a result of the Ponzi Scheme and the "so called" maximum rate provided for in the undisclosed risks, the perpetual ARPS pay only a fraction of what would be an appropriate rate of return for a similar security. Nuveen's North Carolina Funds are treating the ARPS money as a windfall. As of 2008 the ARPS issued by Nuveen Closed End Funds generated more than $1 billion in fees a yer. Nuveen has always intended to treat the ARPS as equity securities. According to Nuveen's Chief Administrative Officer (Earnings Call Transcript March 3, 2008): "...there is $15 billion, roughly 55 to 60 basis points…the preferred securities related to our closed-end funds are perpetual; they're equity securities, so there is no maturity related to those shares…there's no contractual need to de-lever on a maturity in the security." Since February 2008, Nuveen and Mesirow have treated the ARPS monies as a windfall.

45. Auction Rate Securities represented an ingenious attempt to make a square appear to be a circle. Nuveen created a complex funding instrument that appeared to be long-term from the perspective of the borrowers, the Nuveen Municipal Funds and specifically, the North Carolina Municipal Funds that the Kastels invested in, but short-term from the perspective of the Kastels and other investors. After February 2008, the unsuspecting ARPS investors discovered what Nuveen

33

and Mesirow knew, that: SUCH AN ARRANGEMENT WAS IMPOSSIBLE. "If a funding instrument is long-term for one party, it must be long-term for the counterparty; any appearance to the contrary must be an illusion." (Chicago Fed, The Federal Reserve of Chicago Letter Number 256 dated November 2008)[Emphasis added]

46. Nuveen created the "illusion" that the "ARPS … had a long history and a widespread reputation as both providing attractive after-tax returns and being highly liquid". (Letter on behalf of certain Nuveen ARPS Funds filed with SEC by its Counsel on July 27,2009). The illusion was further advanced by Nuveen's ARPS marketing materials which stated "Nuveen Munipreferred, A Great Place for Short Term Money". The materials contained limited, but nevertheless misleading and incomplete disclosures that were discovered by the Kastels on March 11, 2009.

47. Days before Mesirow invested almost all the Kastel moneys in the Nuveen North Carolina ARPS, an advisory issued by a leading Financial Group published a warning that Auction Rate Securities "the slight yield advantage available today does not merit the INHERENT RISKS…." (SVB Financial Group Advisory date August 15, 2007. The Kastel discovered this Advisory in 2009.

48. The auctions did not fail because of the credit crisis. The timing of their failure was coincidental because the broker dealers were no longer willing to risk their capital to support Nuveen's intermediate Ponzi scheme. In 2008, the SEC and various States ordered the broker dealers to redeem the Nuveen ARPS they sold to their customers. The SEC investigation is continuing.

49.  Since March 2008, Nuveen has also engaged in a further Scheme to lull the Kastels and other ARPS investors and the SEC and other regulatory agencies into believing that it had a plan to redeem all of it ARPS.  Nuveen has been issuing press releases and statements that it is doing all it can to redeem all of its municipal ARPS.  The true facts are that Nuveen intends to do nothing that will reduce the leverage of its common shareholder or reduce the fees it pays itself for managing the funds.

## LIMITED RECOVERY

50.  On or about July 25, 2008 the Kastel Trust received a confirmation that one share of Nuveen NC Div Adv Pfd Series F had been sold for $25,000.  On or about June 5, 2009, Nuveen redeemed two shares held by the Howard L. Kastel Trust of Nuveen NC Prem Inc Pfd Series Th for $50,000.  At the time of this redemption the account still held 80 ARPS shares.  The redemption represented less than 3% of the Kastel's frozen ARPS. In response to a statement by Kastel "that at this rate I will have to live to 110 to get my money back", a Mesirow Investment Advisor stated that the redemption was a one-time occurrence and Mesirow has no definitive plan to redeem any more of the Kastels' ARPS shares.  At that time none of Joan Kastel's shares had been redeemed.  The lack of a definitive plan was confirmed in a Nuveen letter to Howard Kastel dated July 17, 2009:  "We understand your frustration regarding the fact that to date only a portion of your ARPS have been redeemed and that WE CANNOT PROVIDE YOU WITH A SPECIFIC TIMETABLE AS TO WHEN AND IF YOUR REMAINING ARPS

WILL BE REDEEMED" [Emphasis Added]. The Original Complaint in this case was filed in August 2009.

51. After the lawsuit was filed, Nuveen redeemed the following shares of ARPS: February 17, 2010 18 shares of Nuveen NC Premium Income Series Th for $450,000 held by the Trust and 3 shares of Nuveen NC Premium Income held by Joan Kastel for $75,000. On February 24, 2010 Nuveen redeemed one share of Nuveen NC Prem Income held by the Trust for $25,000. In March 2, 2010 Nuveen redeemed 32 shares of Nuveen NC Divid Adv Mun Fd Pfd Ser W held by the Trust for $800,000. In April 2010, 11 shares valued at $275,000 of Nuveen North Carolina ARPS held by the Trust were redeemed. Eighteen shares held by the trust valued at $450,000 and 2 shares valued at $50,000 held for the account of Joan Kastel have not been redeemed for a total of $500,000. In early 2010, Nuveen announced that it has postponed indefinitely the redemption of said shares. Subsequently, Nuveen announced it planned to resume redemptions, but that has not occurred.The current rate of interest paid on the balance of these Long Term Preferred Shares is one quarter of one per cent.

## DEFENDANTS MOTIVE AND OPORTUNITY

52. Defendants were motivated to commit the allege fraud to cover up the discovery of the scheme which for years had enabled to reap huge profits. Nuveen must have believed that the "tooth fairy" would protect them from discovery of their wrongdoing and find an alternative plan to issue short term securities to leverage $billions of common shares common that the Nuveen Funds issued and sold. What may have started as a legitimate business had become an unlawful

36

Ponzi Scheme.  Neither Nuveen, the Nuveen Funds nor Mesirow wanted to be caught.  By 2007 both Nuveen and Mesirow were caught up in a unlawful scheme that ultimately cost many of the large broker dealers billions of dollars in fines, penalties and redemption costs.  Kastel learned late in 2008 that the decision as to which funds to invest in was made by and  Nuveen's trading desk in accordance with a continuing  undisclosed practice. Kastel had believed that Cohen designated the number of shares to be sold and the funds to be sold and also made the determination as to the funds to be purchased.   Kastel learned later that Mesirow treated the funds as fungible based on the day of the week or their availability.  The shares sold and purchased were held in the Mesirow's name and not the Kastels. Kastel believes that neither Cohen nor Mesirow had a disclosure statement or prospectus in connection with any of the Nuveen North Carolina Funds.

53.  As enumerated in detail in this Complaint, each of participants (Nuveen, Mesirow and the Broker Dealers) acted with a shared perfidious purpose in the conspiracy.  Each of the participants knowingly and intentionally played an active role in the deception perpetrated on the Kastels.  Each of the participants knew of and intended to participate in the fraud.  Each of the participants were parties to written and oral agreements and understandings. These agreements formed the framework for the scheme. The participants conduct is detailed in the complaints and orders issued by SEC and form a strong inference that each of the parties knew of the fraudulent scheme and intended to participate in the fraud. Each of the Defendants acted with particular state of mind with respect to each act or omission

## DISCOVERY OF THE BREACHS

54.  The Kastels discovered that they had been misled on or about  February 15, 2008.  As the auction market collapsed, Cohen sent an email at 9:52 AM to Nuveen at the same time that Mesirow and Nuveen were submitting HOLD orders for the Plaintiffs.  The email read in pertinent part:  "I'm Shocked", Cohen continued "As an advisor and a shareholder in both the ARPS (several million of my own money) and common stocks of your funds Nuveen has not uttered a word about this crisis." " Nuveen has a conflict in that it has two constituencies—the preferred and common shareholders…"  "The preferred shareholders accepted the liquidity risk.."  "My view is that the funds should borrow money and offer liquidity to the preferred shareholders who want to redeem."  To the extent the statement : "Preferred Shareholders accepted the liquidity risk" relates to the Kastels,  the statement is false.  To the extent that it purports to state Cohen owned ARPS, it is hearsay.  Mesirow has refused to provide any information regarding Cohen's shareholdings.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

55.  The $2.2  million dollars represented a significant part of the Kastels' net worth.  The income was material to the Kastel's retirement plan.  After almost two years, a portion of the  Kastels' ARPS have been  redeemed.  Defendants' intentional fraud had an immediate foreseeable major economic and psychological effect on the quality of their lives and their health.  As a result of the Defendants' wrongful conduct, the Kastels  have been forced to sell other securities at a loss of hundreds of thousands of dollars, turn down a loan to their son's small business

38

that was suffering from the credit crisis, cancel vacation plans and other normal expenditures.  At 78 and 76 years of age it is too late for the Kastels to start over. Mesirow's and Nuveen's conduct has caused the Kastels' severe emotion distress. It was foreseeable to the Defendants that their conduct described in this complaint would cause and inflict severe emotional distress.  These allegations go far beyond a simple claim of delay in redeeming the Kastels' shares. Defendants conduct was extreme and outrageous. Nuveen and the Nuveen Funds have taken a "hard ball" attitude—in substance—"Can't you be patient and wait for us to work this problem out".  The Kastels were asked to wait for the world to change.

## LOSS CAUSATION  AND ECONOMIC LOSS

56.  Plaintiffs suffered their loss at the time of the purchases in August and September 2007. The value of the securities at that time was less that the amount paid.  Additionally, Plaintiffs suffered losses each and every time the defendants caused "Hold" order to be placed for their accounts .  Defendants did not place sell orders with the auction agent until after February 15, 2008.  The fact that Plaintiffs did not learn that their economic house had burned down in August and September does not control the date on which the loss occurred.  The Defendants caused that loss just as much as if they through gasoline and a match Plaintiffs economic house.  The failed auctions that occurred in February 2008 did not fix the date of the losses, but rather establish the date when Plaintiffs learned "something" was seriously wrong.  It would take Plaintiffs more than a year to understand the facts and that discovery process continues.  Plaintiff economic loss continues as long as they hold the remaining shares of the Nuveen North Carolina ARPS and until Plaintiffs recover the monies prayed for herein.

57.  On the date the North Carolina ARPS were purchased, the fair market value was materially less than the purchase price of $25,000 a share, that is, the amount that a reasonable investor would pay to purchase a share if the Nuveen had disclosed the liquidity risk to a prospective purchaser.  Plaintiffs allege that they suffered a loss at the time of their purchase since the value of the ARPS was materially less than the purchase price.  The price that was paid was predicated on the shares being short-term and liquid.  The loss was not caused by the auction failure.  Nuveen and Mesirow are estopped by their own wrong doing from asserting that the loss was caused by others.  If the shares were liquid, the plaintiffs would not have suffered a loss by reason of the brokers dealers ceasing to place support bids.  Had the default interest rates for the ARPS been a market rate that reflected the true risks and characteristics of the ARPS, the auctions would not have failed.  Had the true risks been disclosed the shares the Kastels would not have purchased the shares. The defendants purpose was to hide the fraud from discovery by thousands of innocent investors.   The exact  amount of the loss directly attributed to the Defendants wrongful acts can be fixed with reasonable certainty at trial by the value of comparable shares of preferred stock less the amounts received by the Plaintiffs from dividends and the redemption of shares plus statutory interest on the full amount paid for period the shares were held or caused to be held by the defendants.

58.  As alleged above, Defendants engaged in a scheme and course of conduct to sponsor, create, maintain, prop up and perpetuate, for their own benefit, an artificial market for Nuveen North Carolina ARPS in order to inflate the perceived value of these securities and all Nuveen ARPS and to generate underwriting fees,

auction management fees, trail fees and other fees to the detriment of innocent
investors including the Kastels.

59.  The scheme and course of conduct operated as a fraud and deceit on Plaintiffs,
by omitting to disclose material foreseeable risks concerning the market for sale
and redemption of the ARPS and the value and liquidity risks of these investments.
The materialization of the risks concealed from the Kastels was foreseeable.  These
risks materialized when the auction market collapsed on February 13, 2008.

60. But for the Defendants wrongful, fraudulent and deceptive conduct, the interest
would have been substantially higher than what the Plaintiffs received for the
Nuveen ARPS that they purchased since 2003, including the Nuveen North
Carolina ARPS.  The Defendants deceptive conduct caused the interest rates to be
artificially low, considerably lower than the rates that the market would have
placed on them had the investing public been aware of the true characteristics and
risks of the Nuveen ARPS.  Given a higher interest rate, the Kastels would have
received higher dollar amounts of interest and would have been able to purchase
the ARPS at lower rates sufficient to compensate for the lack of liquidity and other
undisclosed risks.  Time and money go hand in hand.  The Defendants know that
receiving less than a market rate on interest for years is a loss.  The Defendants are
in the money business.  The damages the Plaintiffs suffered include the loss of
interest and the reduction in value of the ARPS as measured by loss in value by
reason of the low interest rate and perpetual term as of the date of purchase.  As a
result of the concealed risks, the Defendants received huge and excessive fees and
unconscionably high income and profits that they should be required to disgorge.

61.  As alleged above, Defendants engaged in a scheme and course of conduct to sponsor, create, maintain, prop up and perpetuate, for their own benefit, an artificial market for Nuveen North Carolina ARPS in order to inflate the perceived value of these securities and all Nuveen ARPS and to generate underwriting fees, auction management fees, trail fees and other fees to the detriment of innocent investors including the Kastels.  This scheme and course of conduct operated as a fraud and deceit on Plaintiffs, by omitting to disclose material foreseeable risks concerning the market for sale and redemption of the ARPS and the value and liquidity risks of these investments.  The materialization of the risks concealed from the Kastels was foreseeable.


COUNT I

DECLARATORY JUDGEMENT AGAINST MESIROW


62.  The Kastels repeat and reallege the allegations set forth in Paragraphs 1 through 61 above as if set forth herein.

63.  An actual justiciable controversy exists between the Kastels and Mesirow concerning whether said Defendants have an obligation to repurchase the Kastel's ARPS.

64.  That the claims set forth herein are not subject to an Agreement to Arbitrate and that Mesirow has an obligation to repurchase the ARPS purchased for the Kastels. Accounts and ordering Mesirow to repurchase said ARPS.

## COUNT II

## BREACH OF FIDUCIARY DUTY, CONSTRUCTIVE
## FRAUD FOR BREACH OF FIDUCICARY DUTY, AIDING AND
## ABETTING BREACH OF FIDUCIARY DUTY AND
## CONSTRUCTIVE FRAUD AGAINST MESIROW AND NUVEEN

65. The Kastels repeat and reallege the allegations set forth in the paragraphs above as if set forth herein.

66. The Kastels placed trust and confidence in Mesirow Financial. based upon their reputation. By reason of the entangled relationship between Mesirow and Nuveen and the fact that they actively participated as co-brokers in respect to the Kastels' ARPS shares, they are liable along with Mesirow Financial for and in respect to said breach. The Kastels reasonably relied on the purported expertise of Mesirow Financial in bestowing trust and confidence in Mesirow Financial.

67. Mesirow Financial accepted responsibility and the trust and confidence of the Kastels and thereby assumed a fiduciary duty to the Kastels. Mesirow Financial breached its fiduciary duty to the Kastels by investing in the ARPS that did not comply with the Kastel's stated investment goals and objectives. Mesirow Financial and Nuveen Investments breached their fiduciary duty by intentionally misleading the Kastels into believing that the ARPS were safe and liquid.

68. The Kastels have suffered and will continue to suffer damage and financial loss as a result of Mesirow Financial and Nuveen Investments breaches of duty.

## COUNT III

## VIOLATIONS OF SECTION 10(b) OF THE

## EXCHANGE ACT AND RULE 10 (b) 5 ALL DEFENDANTS

69.  The Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if set forth herein.

70.  From 2006 to February 15, 2008 the Defendants employed manipulative and deceptive devices in violation of Rule 10b-5 promulgated by the SEC, which devices were intended to and deceived the investing public, including the Kastels enabling the Defendants to sell $millions of ARPS to the Kastels including $2.2 million of the securities of the Nuveen North Carolina Funds on which the Defendants made substantial fees and commissions and caused the Kastels to purchase overvalued ARPS from the Defendants including Mesirow And Nuveen.

71..  Defendants, jointly and severally (and each of them) engaged in a scheme to defraud and made untrue statements, in light of the circumstances under which they were made, misleading, in violation of   Section 10 (b) of the Exchange Act and Rule 10b-5.

72.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

73.  Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentations of interstate commerce and/or of the mails, engaged and participated in a comprehensive scheme to defraud and a continuous course of conduct to conceal adverse material information about auction rate securities.

74. The information that Defendants failed to disclose to the Kastels was material information and altered the total mix of information about ARPS made available.

75. Defendants employed manipulative and deceptive devices and contrivances, while in the possession of material adverse information, and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure the Kastels that the ARPS were substantially the same as cash and were highly liquid, safe short-term investment vehicles suitable for the Kastels.

76. Defendants had actual knowledge of the misrepresentations and omissions of material facts or acted with deliberate and intentionally disregarded the truth.. Defendants made the material misrepresentations and/or admissions hereinabove describe for the purpose and effect of (a) concealing the truth about the value, liquidity and risks of the ARPS and (b) supporting the overvalued price and low interest rates for the ARPS.

77. If Bremner or Mesirow did not have the actual knowledge of the misrepresentations and omissions alleged herein, they were reckless in failing to obtain such knowledge and refraining from taking steps necessary to discover that those statements were false and misleading. As a result of the dissemination of the materially false and misleading information the interest rates paid in respect to the ARPS were artificially low and the prices artificially high.

78. At the time of the misrepresentations and omissions, the Kastels were ignorant of their falsity and believed them to be true. The Kastels acted with due diligence, did not act with recklessness and could not have discovered the true facts that Defendants misstated and or failed to disclose.

45

79. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

COUNT IV

VIOLATION OF SECTION 20 (A) OF THE EXCHANGE ACT AGAINST ROBERT P. BREMNER, CHAIRMAN OF THE NUVEEN FUND BOARD

80. As a result of the concealed risks, the Defendants received huge and excessive fees and unconscionably high income and profits that they should be required to disgorge.

81.. As a result of the materialization of the concealed risks, the value of the ARPS was substantially lower than the amount the Kastel paid for the Nuveen North Carolina ARPS. Finally, the interest paid to the Kastels is fraction of the interest sufficient to compensate the Kastels for the lack of liquidity and other risks inherent in the securities.

82. The Kastels repeat and reallege the allegations set forth in the paragraphs above as if set forth herein.

83. Bremner acted as controlling person of the Nuveen North Carolina Funds within the meaning of Section 20(a) of the Exchange Act for reasons alleged in this Complaint. By virtue of Board's statutory responsibility and management control of the Nuveen North Carolina Funds business and involvement in the business and conduct of the Nuveen North Carolina Funds, Bremner and the Board had the power to influence and control and did influence and control, directly or indirectly, the decision making and actions of the Nuveen North Carolina Funds. Bremner and the Board had the power to cause the Funds to discontinue the unlawful practices that Nuveen Investments had instigated and promoted. Bremner had the

46

power, along with other Board members, to stop the Funds participation in the Ponzi scheme. By virtue of his position as a controlling person he liable pursuant to Section 20(a) of the Exchange Act.

## COUNT V
## FRAUD BY ALL DEFENDANTS

84. The Kastels repeat and reallege the allegations set forth in the paragraphs above as if set forth herein.

85. All of said Defendants, and each of them, acted in concert and made material misrepresentations or omissions to the Kastels and other investors in the Nuveen North Carolina Funds with knowledge that those misrepresentations or omissions would be justifiably relied upon by the Kastels in connection with the Kastels decision not to sell the Nuveen North Carolina ARPS prior the time that the auction market process collapsed in February 2008. All of said defendants participated in the operation of the unlawful exchange and the Ponzi described herein and engaged in manipulation and other legal acts and liable to the Kastels and other individual investors in the Nuveen North Carolina Funds.

86. Mesirow and Nuveen, and each of them, provided the Kastels with false information regarding the liquidity of the ARPS and failed to disclose other information that led the Kastels to believe the Nuveen North Carolina ARPS investments conformed with their stated investment goals although Mesirow knew and Nuveen is charged with knowing, as co-broker, that the illiquidity of the ARPS did not meet said investment goals.

87. That the Kastels justifiably relied upon Mesirow's and Nuveen's misrepresentations and omissions of material fact leading to the Kastel suffering damages and financial loss.

88. The Kastels were damaged by the unlawful acts participated in and perpetrated by said all of the Defendants.

## COUNT VI
## NEGILGENT MISREPRESENTATION AGAINST
## MESIROW AND NUVEEN

89. The Kastels repeat and reallege the allegations set forth in the paragraphs above as if set forth herein.

90. Mesirow and Nuveen had an affirmative duty to provide the Kastels with all the material information regarding risks associated with the Nuveen North Carolina ARPS investments, Nuveen's role in sponsoring the ARPS auction process and risks associated with the potential collapse of the ARPS auction process.

91. Mesirow and Nuveen did not exercise due care in obtaining or communicating information to the Kastels. Mesirow and Nuveen negligently made material representations in the course of their business as stated above and knew or should have known that their representations were false.

92. Mesirow and Nuveen made these representations with the intent that the Kastels would be induced to act and the Kastels justifiably relied leading the Kastels to suffer damages and financial loss.

48

## COUNT VII

## RESCISSION AND RELATED RELIEF UNDER THE ILLINOIS
## ACT 815 ILCS 5/1, et seq. AGAINST MESIROW and NUVEEN

92. The Kastels repeat and reallege the allegations set forth in the paragraphs above as if set forth herein.

93. Mesirow and Nuveen violated the Act by:

    a. engaging in transactions, practices and a course of business in connection with the sales of Nuveen North Carolina ARPS which worked a fraud or deceit on the Kastels;

    b. obtaining money through the sale of Nuveen North Carolina ARPS by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

    c. employing devices, schemes and artifices to defraud the Kastels in connection with purchase of the Nuveen North Carolina ARPS; and

    d. offering and selling Nuveen North Carolina ARPS in noncompliance with the Illinois Securities Act.

94. Mesirow and Nuveen are securities dealers;

95. The Kastels properly and timely exercised their right to void and rescind their Nuveen North Carolina investments;

96. Mesirow and Nuveen have failed and refused to return the monies paid by the Kastels;

97. Mesirow's, Nuveen's and Deutsche Bank's actions constitute a violation of the Illinois Securities Act, 815 ILCS 5/1, et seq;

98.  Mesirow and Nuveen are jointly and severally liable to the Kastels for the full amount paid less amounts received together with interest from the dates of payment at the rate of 10% less any dividends paid by the Nuveen North Carolina Funds to the Kastels together with reasonable attorneys fees and costs as provided in the Act.

COUNT VIII

RESCISSION AND RELATED RELIEF UNDER
NORTH CAROLINA STATUTES SECTION 78A-56
AGAINST MESIROW AND NUVEEN

99. The Kastels repeat and reallege the allegations set forth in the paragraphs above as if set forth herein;

100.  Mesirow, Nuveen and Deutsche Bank violated the Securities Act of North Carolina and specifically Section 78-56 by selling Nuveen North Carolina ARPS to the Kastels by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

98. The Kastels did not know that the statements made were untrue or contained omissions of material facts;

99. Mesirow, Nuveen and Deutsche Bank acted willfully and materially aided each other in making said statement omissions;

100. The Kastels have made timely demands to recover the monies paid by certified mail addressed to said Defendants;

101. No offer to  repurchase the ARPS has been made by said Defendants.

50

COUNT IX

COMMISSION OF THE TORT OF INTENTIONAL OR
NEGILGENT INFLICTION OF EMOTIONAL DISTRESS
BY MESIROW AND NUVEEN

102. The Kastel repeat and reallege the allegations set forth in the paragraphs
above as if set forth herein;

105.  A person or corporation is guilty of the Tort of intentional infliction of
emotional distress by reason of extreme and outrageous conduct, which is
intended to cause and does in fact cause severe emotional distress.

106.  It was reasonably foreseeable that the wrongful conduct of said Defendants
that continues to this would cause severe emotional distress to the Kastels and to
other innocent investors in Nuveen Fund ARPS.

107,  These Defendants compounded this tortuous conduct by repeated
suggesting they had a plan to redeem Plaintiffs when knew that, at the time
statements were made, that the statements were false and misleading and would
cause the Kastels to have false hopes that they would be made whole.

108.   The Defendants further compounded this tortuous conduct by repeatedly
suggesting that the Kastels be patient notwithstanding that they would not agree
to redeem the Kastels ARPS in the Kastel's lifetime and that the Kastels would
have to abandon their retirement plan.

51

109. The Kastels' allegation of Fraud, Theft by Deception and Obtaining Monies by False Pretenses, continues after 2 years since the ARPS collapsed and Mesirow's refusal to Funds refusal to rescind the fraudulent ARPS transaction and Nuveen and the Nuveen Funds refusal to redeem the Kastels' ARPS constitute evidence of the extreme and outrageous conduct that is the basis of this claim.

106. The conduct of Mesirow, Nuveen and the Nuveen Funds constitutes a Tort under applicable law.

WHEREFORE, The Howard L. Kastel Trust and Joan H. Kastel pray for:

A. Judgment against Mesirow Financial Inc and Nuveen Investments Inc on Count I of this Complaint as follows:

    1. Declaring that the claims against Mesirow Financial are not subject to Arbitration;

    2. Declaring that Mesirow Financial and Nuveen Investments are jointly and severally liable to repurchase or cause the Nuveen North Carolina Funds to redeem the ARPS purchased by the Kastels;

    3. Ordering Mesirow Financial and Nuveen Investments Inc to repurchase or cause the Nuveen North Carolina Funds to redeem the ARPS purchased by the Kastels;

    4. Awarding the Kastels interest and costs and attorney's fees and such further relief as the Court deems just and proper.

B. Judgment against Mesirow Financial and Nuveen Investments Inc as follows:

    1. Declaring the Cash Account Agreement executed individually by Howard L. Kastel, Dated August 15, 1989, void and unenforceable;

2.  Rescinding the Client Agreement between Joan H. Kastel and Mesirow Financial and returning the funds that the Kastels entrusted to said Defendants;

3) Disgorging all profits earned by Mesirow and Nuveen through the purchase and sale of the North Carolina ARPS;

4) Awarding Compensatory and Punitive and Exemplary Damages;

5) Awarding pre and post judgment interest;

6) Awarding the Kastels reasonable attorney fees and costs and

7) Awarding the Kastels such further relief as the Court deems just and proper.

C.  Judgment against all Defendants for violations of Section 10(b) of the Exchange Act and Rule 10(b)5 against all Defendants as follows:

1) Awarding the Kastels damages not limited to rescission, recessional damages, restitution, disgorgement of ill-gotten gains and profits damages as provided for under law and equity Federal Laws, jointly and severally;

2) Awarding pre and post judgment interest;

4) Awarding the Kastels interest and costs and attorney's fees and such further relief as the Court deems just and proper.

D. Judgment against Robert P. Bremner and the Nuveen North Carolina Funds as follows:

1) Awarding the Kastels damages not limited to redemption of the Kastels ARPS;

2) Awarding the Kastels interest and costs and attorney's fees and such other relief as the Court deems just and fair.

53

E. Judgment against all Defendants for Fraud and Against Mesirow and Nuveen for Negligent Misrepresentation as follows:

    1) Rescinding the transactions and redeeming the ARPS shares held in the Kastels' accounts;

    2) Disgorging all profits and income received by said Defendants in respect to all Nuveen ARPS purchased for the Kastel accounts since January 2003.

    3) Awarding compensatory, punitive and exemplary damages as well as pre and post judgment interest;

    4) Awarding the Kastels costs and attorney's fees and such other relief as the Court deems just and proper.

F. Judgment against Mesirow and Nuveen for violation of the Illinois Securities Act as follows:

    1) Declaring the sale of the North Carolina ARPS void and ordering the full amount paid for said ARPS, together with pre and post judgment interest at the rate of 10% less any amounts received by the Kastels;

    2) Awarding the Kastels attorney fees and costs and such other relief as provided for in Section 5/13 of the ACT.

G. Judgment against Mesirow and Nuveen for violation of the North Carolina Securities ACT specifically Section 78A-56 as follows:

    1) Repay amounts that the Kastels paid for the Nuveen North Carolina ARPS together with interest at the legal rate, costs and attorney's fees less the amount of income received by the Kastels on the ARPS;

2) Declare that said rights and remedies are in addition to any other rights that the Kastels at law or in equity as herein and above prayed for in this complaint and punitive damages as provided for;

3) Such other relief as the Court deems just and proper.

4) By reason of the fraud perpetrated as above described and in the case of the Funds the receipt of the Kastels' monies from the Kastel Accounts at Mesirow, the Defendants repay amounts that the Kastels Nuveen North Carolina ARPS with interest;

5) Disgorge all profits earned by the Defendants for the ARPS sold by fraud and deception to the Kastel and North Carolina investors;.

6) Award compensatory and Punitive and Exemplary damages to the Kastels;

7) Award pre and post judgment interest and reasonable attorney's fees and costs to the Kastels;

8) Award the Kastels such further relief as the Court deems just and proper.

H. Judgment against Mesirow and Nuveen

1) Award the Kastels damages not less than three times the amount taken and withheld from the Kastels as shall be determined by the by the jury at trial for the emotional distress suffered by the Kastels by reason of these Defendants intentional and extreme and outrageous conduct in refusing to redeem the Kastels' ARPS;

JURY TRIAL DEMANDED

The Plaintiffs, Howard L. Kastel Trustee under the Howard L. Kastel Trust dated November 13, 1985 and Joan H. Kastel hereby respectfully demand a trial by jury.

Dated: October 18, 2010

Respectfully submitted

/s/ Howard L. Kastel

Howard L. Kastel

919-933-3181

10393 Holt

Chapel Hill, North Carolina 27517

N.C. State Bar #34615

Admitted to Practice before the U.S. District Court for the Middle District of North Carolina

57